STATE OF NORTH CAROLINA v. MAY FRANCES SPINKS

No. 7818SC880

(Filed 2 January 1979)

**Homicide § 27.2— involuntary manslaughter—jury instruction negating self-defense—error**

In a prosecution for second degree murder, the trial court's instruction on involuntary manslaughter that "the defendant's act was unlawful in the use of a deadly weapon" tended to take from the jury the opportunity to decide whether defendant's pointing of the gun was justified and thus negated self-defense.

APPEAL by defendant from *Crissman, Judge*. Judgment entered 26 April 1978 in Superior Court, GUILFORD County. Heard in the Court of Appeals 6 December 1978.

Defendant was indicted for second degree murder in the death of James Russell Grimes, who was found shot on the evening of 2 May 1977. The State presented evidence that later that evening defendant made a statement to the police that she and Mr. Grimes had been in an argument that evening and he had slapped her. When he left, she went next door and called the police. She returned home, and when she saw Grimes coming back she hid, taking her .22 caliber pistol with her. Grimes started turning over furniture and tearing down pictures. When he left again defendant gathered together her five children and tried to leave in her car, but it would not start. She got out of the car and saw Grimes coming toward her. He stopped six or seven feet

State v. Spinks

away and she asked him, "Why did you tear up my house?" He replied, "God damn it, I meant to do it." Grimes then started running toward her. Defendant pulled the pistol out of her pocketbook, started running toward her apartment, and fired the gun behind her one or two times. She did not know she had hit him until she saw through the window that a crowd was gathering around him.

Officers at the scene testified that the living room of defendant's apartment was messed up and furniture was turned over. A small caliber pistol and two spent cartridges were found behind the chair in which defendant was sitting when the police arrived. Fourteen rounds of live .22 ammunition, a pair of wire-cutters, and a can of beer were found in the pockets of the deceased.

Officer Travis of the Greensboro Police Department took defendant to the police station for questioning. He testified that on the way he asked her no questions and did not talk to her except to answer two questions she asked; that "she made the statement that she did not care if he was dead; that he had beat on her for the last time. She stated that she didn't care if she had to serve a thousand years; she was glad." At the police station defendant told Officer Travis that Grimes had been her boyfriend for seven and a half years and was the father of her youngest child. She made essentially the same statement that she had made to Officer League earlier in the evening.

Defendant's testimony about the events on the day of the shooting was essentially the same as the statements she had given to the police. She testified that when Grimes came toward her after her car wouldn't start "I told him the police were coming. And he told me he was going to kill me. And he said, 'I told you if you put me in jail again I am going to kill you.' And he started running on me. And I said, 'Billy, please don't hurt me. Please leave me alone.'" She testified that in April of 1977 he had threatened to kill her, and that in January of 1976 he had come looking for her with a shotgun because she was late getting home from school. In October of 1976 they had a fight and Grimes tried to cut her with a knife.

Lula May Corley testified as to defendant's good reputation in the community. She was called to come to the police station after defendant was taken there on the night of the shooting.

Defendant said to her, "I killed Billy, but I didn't mean to do it." Elizabeth Williamson, defendant's neighbor, testified that she saw Grimes coming across the yard toward defendant, saying "I am going to kill you."

Ersula Lee, defendant's aunt, testified to the January 1976 incident when Grimes came after defendant with a shotgun and threatened to kill her. Defendant's face and arms and back were all scratched up that day. Marion Spinks, defendant's mother, testified about the incident in October 1976 when Grimes threatened defendant with a knife. She got him to give the knife to her, and he told her "[I]f it hadn't been for you, I'd have . . . killed her." Thomas Riggins also testified that in October 1976 he saw Grimes put a knife to defendant's throat and say he was going to kill her.

George Spinks, defendant's brother, testified that he was riding with Grimes in a car on the day of the shooting, and that Grimes, on the way to defendant's house, kept saying "I am going to get that ass," referring to defendant. Dorothy Sligh testified that she had been present at a fight between Grimes and the defendant, and that Grimes had threatened to kill anyone who called the police. She knew Grimes' reputation in the community as a dangerous and violent fighting man.

The defendant was convicted of involuntary manslaughter and sentenced to 10 years. She appeals.

*Attorney General Edmisten, by Associate Attorney Thomas H. Davis, Jr., for the State.*

*Anne B. Lupton for defendant appellant.*

ARNOLD, Judge.

The defendant assigns error to the judge's charge on involuntary manslaughter, arguing that the effect of the charge was to direct the jury to find her guilty of involuntary manslaughter. After instructing the jury on second-degree murder, voluntary manslaughter, and self-defense, the judge charged:

> If you do not find the defendant guilty of second degree murder or voluntary manslaughter, you would then consider whether or not she would be guilty of involuntary manslaughter.

Now, involuntary manslaughter is the unintentional kill-ing of a human being by an unlawful act, not amounting to a felony, or by an act done in a criminally negligent way.

The defendant's act was unlawful in the use of a deadly weapon.

The jury, after some deliberation, returned to the courtroom to ask the judge for "a further definition of two of the verdicts." The judge again instructed them on all four possible verdicts, con-cluding with regard to involuntary manslaughter: "the State must prove . . . beyond a reasonable doubt . . . that the defendant acted unlawfully or in a criminally negligent way in this shooting. I described to you that the use of a gun in this manner would be an unlawful act. . . . ."

The judge correctly charged the jury on the elements of in-voluntary manslaughter. Involuntary manslaughter is the uninten-tional killing of another by (1) an unlawful act not amounting to a felony or (2) a lawful act done in a culpably negligent manner. 6 Strong's N.C. Index 3d, Homicide § 6.1. We are concerned with the jury charge in this case only as it relates to the first alter-native, that is, an unintentional killing resulting from an unlawful act. The State argues that the charge was proper, since G.S. 14-34 makes pointing a gun at any person an unlawful act. However, our courts have long recognized that the strict language of the statute is subject to the qualification that an intentional pointing of a gun violates the statute only if it is done without legal justification. *Lowe v. Dept. of Motor Vehicles*, 244 N.C. 353, 93 S.E. 2d 448 (1956); *State v. Stitt*, 146 N.C. 643, 61 S.E. 566 (1908). In this case, then, if the jury found that the defendant acted in self-defense they could not have found her guilty of involuntary manslaughter under the first alternative. The effect of the judge's instruction that "[t]he defendant's act was unlawful" tended to take from the jury the opportunity to decide whether defendant's pointing of the gun was justified. This is prejudicial error. A number of cases have held peremptory instructions in criminal cases improper, *e.g. State v. Godwin*, 227 N.C. 449, 42 S.E. 2d 617 (1947); *State v. Lawson*, 209 N.C. 59, 182 S.E. 692 (1935), and while the instructions in those cases were more overtly peremptory than the one here, we find that the effect is the same.

The State argues that *State v. Walker*, 34 N.C. App. 485, 238 S.E. 2d 666 (1977), *cert. den.* 294 N.C. 445, 241 S.E. 2d 847 (1978), should control our decision here. In that case the trial court had instructed the jury:

> If you do not find the defendant guilty of second degree murder or voluntary manslaughter but the state has proven beyond a reasonable doubt that he did not act in self-defense, then you must determine whether the defendant is guilty of involuntary manslaughter.

and this Court said:

> The jury, when it considered the crime of involuntary manslaughter, had rejected self-defense. Since defendant was not acting in self-defense, he was acting unlawfully in pointing the gun close to Shores and firing it for the purpose of scaring him, as his testimony tends to show.

*Id.* at 487, 238 S.E. 2d at 667.

While the court, in the case *sub judice*, did instruct the jury that a killing would be excused on the ground of self-defense we cannot say that the jury had already rejected self-defense at the time it considered involuntary manslaughter. It appears that the subsequent instruction that "the use of the gun in this manner would be an unlawful act" negated self-defense, especially as it related to whether the shooting was an unlawful act upon which to find defendant guilty of involuntary manslaughter.

It is not necessary to discuss the remaining assignments of error since they are unlikely to recur at a new trial, which must be granted for error in instructing the jury that "the defendant's act was unlawful."

New trial.

Judges VAUGHN and MARTIN (Robert M.) concur.