STATE OF NORTH CAROLINA v. JIMMY DARRELL RAY

No. 19

(Filed 1 February 1980)

1. **Homicide §§ 26, 27 — murder — voluntary and involuntary manslaughter — instructions on intent incorrect**

    The trial court's distinction between the intentional homicides of murder and voluntary manslaughter and the unintentional homicide of involuntary manslaughter was not altogether correct where the court instructed that the former crimes required an intent to kill while the latter did not, and the court thus focused on the presence or absence of an intent to kill rather than on the presence or absence of an intentional act.

2. **Criminal Law § 115 — improper instruction on lesser offense — when error is prejudicial**

    Where there is no reasonable possibility that a verdict more favorable to defendant would have occurred absent an erroneous instruction on a lesser offense not supported by the evidence, the error occasioned by such instruction is harmless; however, where there does exist a reasonable possibility that defendant would have been acquitted had not the lesser offense been erroneously submitted, the error is prejudicial and defendant is entitled to appellate relief.

3. **Homicide § 30.3 — lesser offense of involuntary manslaughter improperly submitted — prejudicial error**

    Defendant in a murder prosecution was prejudiced by the trial court's erroneous submission of the lesser offense of involuntary manslaughter and by the court's misleading definition of that offense, since, had the charge of involuntary manslaughter not been submitted, the jury would have been forced to determine whether defendant's intentional shooting of the victim was in the exercise, perfectly or imperfectly, of his right to defend himself and his brother, and, given the strong tendency of the evidence to demonstrate justification for defendant's plea, there was a reasonable possibility that a verdict of acquittal might have resulted. G.S. 15A-1442.

4. **Criminal Law § 168 — lesser included offense improperly submitted — error not favorable as matter of law**

    A verdict based upon the erroneous submission of a lesser included offense not supported by the evidence does not invariably constitute error favorable to a defendant as a matter of law.

Justice BROCK did not participate in the consideration or decision of this case.

Justice COPELAND dissenting.

Chief Justice BRANCH joins in the dissenting opinion.

BEFORE *Judge Canaday* at the 12 December 1977 Session of WAKE Superior Court defendant on a proper indictment for murder was convicted by a jury of involuntary manslaughter in the death of Larry Caudle. He was sentenced to a term of imprisonment of not less than 8 nor more than 10 years. The Court of Appeals (*Judges Webb* and *Hedrick* and *Chief Judge Morris*), in an unpublished opinion reported pursuant to App. R. 30(e), found no error. We allowed defendant's petition for further review pursuant to G.S. 7A-31 on 4 April 1979.

*Rufus L. Edmisten, Attorney General, by Jo Anne Sanford, Assistant Attorney General, for the State.*

*George R. Barrett, Attorney for defendant appellant.*

EXUM, Justice.

Defendant was tried on an indictment charging him with the first degree murder of Larry Caudle. At trial Judge Canaday at the close of all the evidence dismissed the charge of first degree murder and submitted to the jury alternative verdicts of second degree murder, manslaughter, involuntary manslaughter, not guilty, and not guilty by reason of self-defense and defense of another. All the evidence, including defendant's own testimony, demonstrated that defendant intentionally shot Caudle and the wound so inflicted caused Caudle's death. The defense rested entirely on the theory that defendant's shooting of Caudle was justified on the grounds of self-defense and defense of defendant's brother, Donald Ray.

The only question properly presented to us[1] is whether it was error prejudicial to defendant to submit an alternative verdict of involuntary manslaughter. We conclude that under the circumstances of this case it was. The Court of Appeals relied on the general rule that submission of a lesser included offense not supported by the evidence is error nonprejudicial to a defendant. It therefore upheld defendant's conviction. We recognize the general

---

1. Defendant argued the insufficiency of the evidence to convict in the Court of Appeals but he does not bring this argument forward in his brief submitted to this Court. This argument is therefore deemed abandoned. App. R. 28. Defendant also attempts to argue before this Court an alleged error in the jury instructions which he did not argue in the Court of Appeals. This point is not properly cognizable in this Court. App. R. 16(a).

State v. Ray

rule but conclude that it has no application to the situation here presented. The decision of the Court of Appeals is reversed; the judgment of the trial court is vacated; and the defendant is ordered discharged.

The only witnesses to this homicide were defendant and his brother. The state called defendant's brother. It also offered defendant's out-of-court statements to investigating law officers. Defendant testified in his own behalf.

Defendant's brother, Donald Ray, testified essentially as follows: On 31 March 1975 at approximately 2:00 a.m. defendant arrived at Donald's trailer on the "outskirts of Wake Forest." Defendant asked Donald to accompany him to 713 North Main Street in Wake Forest where defendant lived with his and Donald's father. Donald agreed. When they arrived, defendant asked Donald to go in the house and get his pistol. Donald did and returned the pistol to defendant who was still sitting in the car.[2] Defendant then told Donald that "someone was coming to kill him [defendant]" and that Donald should go in the house. Donald returned to the house. Three or four minutes later Caudle drove up, got out of his car with a shotgun in his hand, went to defendant's car and told defendant he was going to "blow his brains out." Donald, still in the house, hollered at Caudle, "Leave my brother alone." Caudle replied, "If I don't kill him, I'll kill you." Caudle put down the shotgun and approached the house with a pistol in his hand. Donald closed the door. Caudle shot twice through the door. One shot wounded Donald in the left hand. Then a third shot came through the window. Donald ran back to his father's bedroom. He heard one or two more shots and then heard the defendant holler. Donald and his father, Jessie Ray, went outside to defendant and all three traveled in defendant's car to the police station where an ambulance was summoned for Donald.

Willis Rogers, a Wake Forest policeman at the time of the incident, testified for the state that when defendant came to the police station defendant stated that Caudle had shot his brother in the hand. Rogers stated, "I asked Jimmy Ray where Larry

2. The record indicates that defendant was, apparently due to an accident, paralyzed from the waist down. He could drive a car and he used a wheelchair which he transported in his car.

Caudle was and he said he didn't know. He said he emptied his gun when he was crossing the highway. Didn't know whether he hit him or not, but hoped goddamit he killed him." Rogers went to defendant's residence to investigate the incident. He found Caudle's body lying between two vehicles across the highway from defendant's residence and also found blood on the porch and in the yard. He was able "to track" the blood from across the highway back to the house. Defendant returned to the scene and offered no resistance when he was taken into custody.

The pathologist who performed the autopsy on Caudle testified for the state that he found several bullet wounds but that the cause of death was "internal bleeding into the chest as a result of a through and through bullet wound in the left chest. Entrance was from the back." He said the deceased could have run the 256 feet from the house to where his body was found, even after the fatal wound was inflicted, "as the heart was not damaged and the deceased could walk, run, or do some activity in a period of a number of seconds." The deceased's blood alcohol content was 240 milligrams, or .24 grams, percent, *i.e.*, per 100 cubic centimeters of blood.

The state also offered in evidence the written, signed out-of-court statement made by defendant to investigating officers. According to this statement defendant and Caudle had been close friends for many years and had never had any trouble with each other. Defendant and Caudle had been together earlier in the evening on the day in question. An incident occurred which made defendant angry with Caudle and they separated. Later they got in touch with each other on their automobile citizens' band radios. Caudle began to curse and defendant told him "to come up to my house and let's talk." The statement then continued:

"Larry said he would be there in a few minutes. Got there. Came out of car with shotgun and pointed it at my head. My brother called to him and then he started shooting at my brother. Shot into my house and hit my brother. Then called him and shot him and did not think I hit him then.

I thought he was going to shoot me so I shot him two more times. Then he ran across road. When he ran off I shot his car in the front. Shot car so he could not leave on his car. Larry was wild. Had never seen him act that way. Been close friends many years. Never no trouble before. Wish he had

shot me for I have nothing to lose and he has wife and three kids. Knew he carried the .25 caliber always."

Albert Caudle, the deceased's father, testified for the state that on the evening in question his son woke him up getting a shotgun from the house. He said that his son "went out and didn't speak a word . . . . I guess he was mad. I didn't try to stop him. I just asked him what the trouble was and followed him to the car. . . . I figured it was trouble when he got his gun. . . . His wife was trying to stop him but he never spoke to her. He did knock her down. She tried to stop him but she got hold of the gun and he whirled around and she fell backwards. She was trying to stop him. . . . I figured my son and Jimmy Ray to be good friends. I never know them to have any harsh words. My son had a CB radio and Jimmy Ray had a CB radio and they talked back and forth on the radio before. Larry started to tell me something but a voice came over the CB radio, and said, you son-of-a-bitch, ain't you coming over here. Then Larry said, I'll be there in a minute or two."

At the close of the state's evidence defendant moved for dismissal on the ground that all the evidence showed that he shot Caudle in defense of himself and his brother. The motion was denied.

Defendant testified that on the evening in question at approximately 11:00 p.m. he was driving on Main Street in Wake Forest when he met Caudle who got into defendant's car. Caudle had been drinking. They went to Rudy Horton's, "a beer joint," where Caudle went in. After 15 to 20 minutes Caudle returned with two men who were not known to defendant. The three of them got into defendant's car and they all rode to the Community Grocery in Wake Forest. There Caudle got out and did not return. After 10 minutes defendant told the two men that he was going to leave. One tried to stop him but defendant left anyway. At their request defendant returned the men to Horton's. On his way home defendant heard Caudle speaking on the CB radio. Defendant broke in and asked Caudle where he had gone at the Community Store. Caudle didn't answer. Defendant asked why Caudle got out of the car and "left me like that." He told Caudle he wanted to see him. Caudle became angry, started cursing, and threatened defendant. Caudle was "cussing on the radio,

something I never heard him do and I knew he was mad and that he carried a gun." Defendant then drove to his brother's house.

Defendant and his brother then returned to defendant's residence. Defendant said, "I was getting my wheelchair out to get out of the car when Bubba [defendant's brother] brought me the gun. My wheelchair was setting on the ground. I had not put my pulley in yet. I was getting ready to get in the wheelchair when Larry Caudle came up. He slid into the yard sideways. He got out of his car with a shotgun and squatted down behind his door and was aiming the shotgun toward me and then he got up and came over to my car and stuck the gun in the window right in my face and told me he was gonna blow my damn head off.

"Bubba was standing in the door with the door partially opened. He told Larry to leave me alone. Larry set the shotgun down and leaned up against my car and ran over there with his pistol. He took his pistol out of his pocket and told Bubba he would take care of him first. He ran up on the porch. Bubba slammed the door and Larry ran against the door and tried to go in the house, I reckon.

"Larry shot through the door and I heard my brother holler. I called Larry's name with my gun in my hand. He didn't pay me no mind. He shot again. Then I shot at him. I aimed down low the first time because I knowed it would kill him if I shot him higher. After I shot him he turned toward me. He still had his gun in his hand. As soon as he turned in my direction I fired twice. After I fired he ran in front of my car, crossed the street and the last time I ever saw him was over at the corner of the building at the poolroom.

. . . .

"My brother and Daddy got in the car and I drove. When I backed up I struck Caudle's car, left and went to the police station. I told them that my brother had been shot and Larry had done it. I didn't know whether I had shot Larry or not. I thought I had missed him. I was upset over my brother being shot. He was bleeding a lot.

"Larry Caudle was a friend of mine, my best friend. He appeared angry that evening. I had never seen him like that before. I thought he was gonna kill my brother. He used to spend nights

with me. I thought Larry was facing me when the last two shots were fired. He was still up on the porch."

At the close of all the evidence defendant's motion to dismiss on the ground that all the evidence demonstrated that he shot Caudle in defense of himself and his brother was again denied. Judge Canaday then proceeded to instruct the jury that it could return a verdict of guilty of second degree murder, manslaughter, or not guilty by reason of self-defense and defense of another. He then instructed that the jury could find defendant guilty of involuntary manslaughter or not guilty. He defined involuntary manslaughter as the "unintentional *killing* of a human being by . . . an act done in a criminally negligent way . . . ." (Emphasis supplied.) During their deliberations the jury returned to the court and asked to hear again the court's definitions of the various degrees of homicide. Again Judge Canaday instructed them that:

"COURT: Second degree murder is defined as the unlawful killing of a human being, that is an *intentional killing* of a human being and with malice. You must have unlawful killing. *It must be intentional* as I have defined intent to you, and it must be accomplished with malice. The State must show those elements.

Now voluntary manslaughter is the unlawful killing of a human being without malice. There need be no showing of malice. Voluntary manslaughter, *the State must show intent, must be an intentional killing,* but without malice.

Now involuntary manslaughter is the *unintentional killing* of a human being, by an act done in a criminally negligent way.

Now I will repeat those definitions again for you. Going upward. Involuntary manslaughter is the unintentional killing of a human being by an act done in a criminally negligent way.

Involuntary manslaughter, *no intent is required in that offense.*

Voluntary manslaughter is the unlawful killing of a human being without malice, there being no malice, but it is intentional, it is unlawful.

Second degree murder is the unlawful killing of a human being, that is an intentional killing, with malice." (Emphasis supplied.)

Thus Judge Canaday told the jury that one difference between second degree murder and manslaughter on the one hand and involuntary manslaughter on the other was that the former crimes required an intent to kill while the latter did not. He did not instruct the jury again on the principles of self-defense or defense of another.

[1] Judge Canaday's distinction between the intentional homicides of murder and voluntary manslaughter and the unintentional homicide of involuntary manslaughter is not altogether correct. Neither second degree murder nor voluntary manslaughter has as an essential element an intent to kill. In connection with these two offenses, the phrase "intentional killing" refers not to the presence of a specific intent to kill, but rather to the fact that the *act* which resulted in death is intentionally committed and is an act of assault which in itself amounts to a felony or is likely to cause death or serious bodily injury. Such an act of assault committed under circumstances sufficient to show malice is second degree murder. Such an act of assault committed in the heat of passion suddenly aroused by adequate provocation, or in the imperfect exercise of the right of self-defense, is voluntary manslaughter. But such an act can never be involuntary manslaughter. This is so because the crime of involuntary manslaughter involves the commission of an act, whether intentional or not, which in itself is not a felony or likely to result in death or great bodily harm. *See generally State v. Wilkerson*, 295 N.C. 559, 247 S.E. 2d 905 (1978); *State v. Wrenn*, 279 N.C. 676, 185 S.E. 2d 129 (1971).

All the evidence in this case is that defendant intentionally assaulted Caudle with a deadly weapon, causing Caudle's death. The assault was one likely to kill or inflict serious bodily injury. Therefore the homicide which resulted, if any, was at least voluntary manslaughter. Furthermore defendant's evidence, and practically all of the state's evidence, tend to establish that defendant shot Caudle in defense of himself and his brother. The only evidence offered by the state which could support a verdict of voluntary manslaughter lies in the out-of-court statement alleged-

ly made by defendant to policeman Rogers. Rogers testified, "I asked Jimmy Ray where Larry Caudle was and he said he didn't know. He said he emptied his gun when he was crossing the highway. Didn't know whether he hit him or not but hoped goddamit he killed him." The most favorable inference to the state which could arise from this testimony is that defendant shot Caudle when Caudle was retreating from the affray and no longer presented a threat either to defendant or his brother. If found as fact by the jury, such a use of excessive and unnecessary force could support a verdict of voluntary manslaughter, or even of murder in the second degree. *See, e.g., State v. Quick*, 150 N.C. 820, 64 S.E. 168 (1909). In any event, there was no evidence presented in the case upon which a jury could base a verdict of involuntary manslaughter.

The question for decision, then, is whether under the circumstances of this case it was error prejudicial to defendant for the trial judge to submit to the jury the alternative verdict of involuntary manslaughter. This Court has generally held that the submission of a lesser included offense not supported by the evidence is error, but error nevertheless favorable to the defendant and one for which he cannot complain on appeal. The point seems first to have been made in homicide cases in *State v. Matthews*, 142 N.C. 621, 55 S.E. 342 (1906). Defendant there was indicted for the first degree murder of his wife. The evidence tended to show that he poisoned her, but there was also some evidence that he was under the influence of morphine when he administered the poison. The trial court instructed the jury that if defendant had been so narcotized by morphine that "he was unconscious of the character of the crime he was committing, he would not be guilty of murder in the first degree for want of power to deliberate and act with premeditation . . . and he would be guilty of murder in the second degree." On appeal from a verdict of second degree murder, defendant contended that there was in fact no evidence to support the lesser verdict. This Court found no error, saying, *id.* at 625-26, 55 S.E. at 343-44:

> "Nor is intentional homicide by poisoning necessarily always murder in the first degree. . . . There is no exception to this charge and we do not pass upon it, but the jury may have taken that view of the evidence. *But whatever the reasoning of the jury, the prisoner has no cause to complain that he*

*was not convicted of the higher offense."* (Emphasis supplied.)

*State v. Quick, supra,* 150 N.C. 820, 64 S.E. 168, involved a homicide by shooting in the course of a barroom brawl. Defendant was tried for second degree murder and convicted of voluntary manslaughter. Defendant, who had relied on self-defense at trial, contended on appeal that there was no evidence to support the manslaughter conviction and the trial court improperly submitted this view of the case to the jury. This Court concluded that there was evidence of voluntary manslaughter to support the charge. In *dictum*, however, the Court said, 150 N.C. at 823-24, 64 S.E. at 170:

> "Suppose the court erroneously submitted to the jury a view of the case not supported by evidence, whereby the jury were permitted, if they saw fit, to convict of manslaughter instead of murder, what right has the defendant to complain? It is an error prejudicial to the State, and not to him. His plea of self-defense had been fully and fairly presented to the jury and rejected by them as untrue. What, then, was the duty of the jury, if there was no evidence of manslaughter? Clearly, under the law, they should have convicted the defendant of murder in the second degree. How, then, can the defendant, his plea of self-defense having been wholly discarded by the jury and the burden being upon him to reduce the offense to something less than murder in the second degree, reasonably complain of a charge, however erroneous in that respect, which permitted the jury to convict of a lesser degree of homicide?

> The appellant, in all cases, civil as well as criminal, is not only required to show error, but that he was injured by it.

> The deduction seems to us to be founded in the very logic of the law that evidence which is amply sufficient to support a conviction of murder must of necessity be sufficient to sustain a conviction of manslaughter. But, independent of that, there are phases of the evidence which warranted a verdict for manslaughter and not for murder, and therefore his Honor's charge is unobjectionable."

Although Justice Walker concurred in the result, he disagreed with the majority's view that no error prejudicial to the defendant would have occurred had there been no evidence of manslaughter in the case. Justice Walker said, "I think that a conviction must be founded not alone upon the charge preferred in the indictment, but upon some evidence sufficient in law to establish it." *Id.* at 826, 64 S.E. at 171.

The same holding and *dictum* occur in *State v. Fowler*, 151 N.C. 731, 66 S.E. 567 (1909).

In *State v. Bentley*, 223 N.C. 563, 27 S.E. 2d 738 (1943), defendant was indicted for assault with intent to kill with a deadly weapon, to wit, a shotgun, inflicting serious injury. The evidence tended to show that defendant shot the victim wounding him in the chest and putting out one eye. The jury returned a verdict of guilty of assault with a deadly weapon, an alternative which was not submitted to them by the trial court. On appeal defendant sought to be discharged on the ground that there was no evidence of the offense of which the jury convicted him. The Court rejected this argument saying, 223 N.C. at 566, 27 S.E. 2d at 740:

> "If we are to understand the appellant to base his demand for discharge merely on the fact that the jury by an act of grace has found him guilty of a minor offense, of which there is no evidence, instead of the more serious offense charged, this is to look a gift horse in the mouth; more especially, since the conclusion that there is no evidence must be reached by conceding that all the evidence, including the admission of the defendant, points to a graver crime. Such verdicts occur now and then, despite the efforts of the courts to discourage them. When they do, although illogical or even incongruous, since they are favorable to the accused, it is settled law that they will not be disturbed."

Similar reasoning was employed in *State v. Roy*, 233 N.C. 558, 64 S.E. 2d 840 (1951) (indictment for rape; rape proved; verdict: assault with intent to commit rape); *State v. Chase*, 231 N.C. 589, 58 S.E. 2d 364 (1950) (indictment for armed robbery; armed robbery proved; verdict: common law robbery); and *State v. Robertson*, 210 N.C. 266, 186 S.E. 247 (1936) (indictment for burglary; burglary proved; verdict: attempt to commit burglary).

In *State v. Stephens*, 244 N.C. 380, 93 S.E. 2d 431 (1956), defendant was tried for the murder of his wife. The evidence tended to show that defendant purchased dynamite the day before a severe explosion occurred in his home in which his wife was killed. There was other circumstantial evidence tending to show that the explosion was caused by dynamite and that defendant was present in the kitchen immediately before and was absent at the exact time of the explosion. The verdict was guilty of manslaughter. This Court said, 244 N.C. at 384, 93 S.E. 2d at 434:

> "Evidence of manslaughter is lacking. The defendant, however, cannot complain that 'the jury, by an act of grace,' has found him guilty of a lesser offense. 'Such verdicts occur now and then, despite the efforts of the courts to discourage them. When they do, although illogical or even incongruous, since they are favorable to the accused, it is settled law that they will not be disturbed.' *S. v. Bentley*, 223 N.C. 563, 27 S.E. 2d 738; *S. v. Roy*, 233 N.C. 558, 64 S.E. 2d 840; *S. v. Matthews*, 231 N.C. 617, 58 S.E. 2d 625; *S. v. Harvey, supra,* [228 N.C. 62, 44 S.E. 2d 472]; *S. v. Robertson*, 210 N.C. 266, 186 S.E. 247."

More recently the Court carefully considered the principle in question and relied on it wholly in the disposition of *State v. Vestal*, 283 N.C. 249, 195 S.E. 2d 297, *cert. denied*, 414 U.S. 874 (1973). In *Vestal*, defendant was charged with the first degree murder of Angelo Pennisi. Pennisi's body had been found floating in a lake wrapped with a length of window drape and approximately seventy pounds of heavy chains. He had been severely beaten about the head and his skull was fractured in several places. Although evidence linking defendant to Pennisi's death was entirely circumstantial, defendant was convicted of murder in the second degree. On his first appeal, defendant complained *inter alia* of the trial court's failure to submit manslaughter as an alternative verdict. This Court held that this was not error, there being no evidence in the record to sustain a verdict of manslaughter. The Court did however find various other errors and remanded for a new trial. *State v. Vestal*, 278 N.C. 561, 180 S.E. 2d 755 (1971).

At Vestal's second trial he was convicted of manslaughter, the then trial judge, now Justice, Copeland having submitted this

as an alternative verdict. On Vestal's second appeal he contended that the verdict should be set aside since there was no evidence of manslaughter. Surmising that Judge, now Justice, Copeland had been induced to submit manslaughter as an alternative verdict because of defendant's objection to its not having been charged at this first trial "even though evidence of manslaughter is lacking," this Court rejected defendant's contention of prejudice:

> "On the question thus presented, our decided cases follow the majority rule and hold that if the court charges on a lesser included offense when all the evidence tends to support a greater offense, the error is favorable to the defendant and he is without standing to challenge the verdict." 283 N.C. at 252, 195 S.E. 2d at 299.

The Court relied essentially on *State v. Stephens, supra,* 244 N.C. 380, 93 S.E. 2d 431; *State v. Chase, supra,* 231 N.C. 589, 58 S.E. 2d 364; *State v. Fowler, supra,* 151 N.C. 731, 66 S.E. 567; and *State v. Quick, supra,* 150 N.C. 820, 64 S.E. 168.

[2] It is clear then that it is error for the trial court to submit as an alternative verdict a lesser included offense which is not actually supported by any evidence in the case. It is also clear that in the cases in which this situation has arisen, this Court has concluded that the error was harmless and indeed actually favorable to the defendant. In all of these cases, however, the evidence was such as to compel this Court to conclude that had the jury not been given the unsupported lesser offense as an alternative, it most certainly would have returned a verdict of guilty of a higher offense. Certainly where it cannot be doubted that the effect of an erroneous charge "was to cause a verdict for the lesser offense to be found . . . than *should* have been rendered," *see, e.g., State v. Alston,* 113 N.C. 666, 668, 18 S.E. 692 (1893) (emphasis supplied), a defendant has no cause for complaint. The principle applied in our cases so far, then, is nothing more than an application of the well recognized doctrine of harmless error, now codified in G.S. 15A-1442 and G.S. 15A-1443. Stated simply, that doctrine provides that only those errors which prejudice a defendant will entitle him to relief on appeal. G.S. 15A-1442. And a defendant is "prejudiced" by errors other than constitutional ones only when "there is a reasonable possibility that, had the error in question

not been committed, a different result [favorable to defendant] would have been reached at the trial . . . ." G.S. 15A-1443. Thus, where there is no reasonable possibility that a verdict more favorable to defendant would have occurred absent an erroneous instruction on a lesser offense not supported by the evidence, the error occasioned by such instruction is harmless. Conversely, where there does exist a reasonable possibility that defendant would have been acquitted had not the lesser offense been erroneously submitted, the error is prejudicial and defendant is entitled to appellate relief.

In the case before us, there is a reasonable possibility that defendant's plea of self-defense would have sustained a verdict of acquittal had the trial court not erroneously instructed on involuntary manslaughter. We recognize that in *State v. Quick, supra*, 150 N.C. 820, 64 S.E. 168, the Court concluded that the return of a verdict of voluntary manslaughter was, in effect, a rejection by the jury of defendant's claim of self-defense. A similar conclusion does not arise, however, upon the return of a verdict of involuntary manslaughter under the particular circumstances of the case before us.

As noted before, a killing in self-defense is necessarily an "intentional killing" insofar as it is accomplished by an intentional act. When asserted in response to a charge of intentional homicide such as second degree murder or voluntary manslaughter, a plea of self-defense is a plea of confession and avoidance. By it a defendant admits, for example, that he intentionally shot his assailant but that he did so justifiably to protect himself from death or great bodily harm. In this case the trial judge correctly submitted self-defense and defense of another as defenses only to the intentional homicides of second degree murder and voluntary manslaughter, not to the unintentional homicide of involuntary manslaughter. Defendant in the instant case testified that he intentionally shot at Caudle but that his initial shot was aimed toward Caudle's feet so as to avoid killing him. He ultimately testified that he did not at the time know whether he had killed Caudle. By this testimony he asked the jury to conclude either that he was guilty of an intentional homicide or that he was not guilty by reason of self-defense or defense of his brother.

**[3]** It is not at all clear, however, that the jury ever considered these alternatives. In his instructions, the trial judge incorrectly distinguished involuntary manslaughter from voluntary manslaughter and second degree murder by focusing on the presence or absence of an *intent to kill* rather than the presence or absence of an *intentional act*. The jury could well have concluded from defendant's testimony that defendant had no actual intent to kill Caudle and that he was therefore guilty of the offense of involuntary manslaughter as that crime was defined by the court. In effect, the erroneous submission of the offense of involuntary manslaughter, coupled with the misleading definition of that offense by the trial court, may have short-circuited the jury's consideration of defendant's claim of self-defense. Had the charge of involuntary manslaughter not been submitted, the jury would have been forced to face squarely the real issue presented by the evidence in this case, *i.e.*, whether defendant's intentional shooting of Caudle was in the exercise, perfectly or imperfectly, of his right to defend himself and his brother. Given the strong tendency of the evidence to demonstrate justification for defendant's plea, there is a reasonable possibility that a verdict of acquittal might have resulted. Certainly, the circumstances of this case make us mindful of Justice Seawell's statement in *State v. McDay*, 232 N.C. 388, 61 S.E. 2d 86 (1950):

> "Where the court below is in error as to the definition of an essential element of a crime, and one which completely diverts the attention of the jury into a different field of inquiry, there is little propriety in speculating whether the instruction given is more harmful, or on the other hand, more favorable to the defendant than the one which ought to have been given, since justice is not a gamble. The defendant is at least entitled to be tried for the identical crime with which he is charged, and convicted or acquitted of it as the case may be."

As noted above, the instant case is one in which all of the evidence, including that posed by defendant's sole reliance on self-defense, demonstrates conclusively that the fatal assault was nothing less than intentional. The evidence is compelling, moreover, that defendant's assault upon the deceased was legally justifiable. Thus the general rule that an erroneous charge on a lesser included offense is error favorable to the defendant "*when*

*all of the evidence tends to support a greater offense," see State
v. Vestal, supra,* 283 N.C. at 252, 195 S.E. 2d at 299 (emphasis sup-
plied), is inapplicable to the facts of this case. Indeed, we have
found no decision in the appellate courts of this state which hold
as a matter of law that the submission and resulting verdict of *in-
voluntary* manslaughter in a case such as this one will always be
harmless error. The holdings relied upon by the state do no more
than show that the finding of prejudice or the lack of it must
always turn upon the facts and circumstances of the individual
case. Thus, in *State v. Bass,* 36 N.C. App. 500, 244 S.E. 2d 458,
*cert. denied,* 295 N.C. 467, 246 S.E. 2d 216 (1978), the Court of Ap-
peals found some evidence in a voluntary manslaughter prosecu-
tion to support the verdict of involuntary manslaughter. The
court's *dictum* in *Bass* that even if the submission of involuntary
manslaughter were in error, it was error favorable to the defend-
ant, seems correct in light of the fact that defendant offered no
legal justification for the fatal shooting. Similarly, both the record
and the language of the decision in *State v. Walker,* 34 N.C. App.
485, 238 S.E. 2d 666, *cert. denied,* 294 N.C. 445, 241 S.E. 2d 847
(1977), support a conclusion that there was sufficient evidence of
involuntary manslaughter in that case. And although the *Walker*
court held that the instruction on involuntary manslaughter was
unwarranted, its finding that the jury passed upon involuntary
manslaughter only after specifically considering and rejecting
defendant's theory of self-defense is supported by the trial court's
explicit instructions evidenced in the record. In the case *sub
judice,* however, it is not at all clear that the jury's verdict of in-
voluntary manslaughter is necessarily equivalent to a considered
rejection of defendant's self-defense plea. While Judge Canaday
gave the same instructions relied on in *Walker* in the main body
of his charge, thereafter the jury requested clarification of his
definitions of the degrees of homicide. At this point Judge Cana-
day gave the jury, as we have already shown, *see* text *supra* pp.
7-8, an incorrect and likely misleading definition of involuntary
manslaughter. He *did* not, furthermore, repeat his earlier instruc-
tions on self-defense. *Compare State v Spinks,* 39 N.C. App. 340,
250 S.E. 2d 90 (1979), a case involving instructions similar to those
in *Walker,* wherein another panel of the Court of Appeals said it
could not conclude that the jury had already rejected self-defense
at the time it considered involuntary manslaughter.

Case law from other jurisdictions supports the proposition that the unwarranted submission of involuntary manslaughter in a homicide case involving a self-defense claim may often result in error prejudicial to a defendant. For example, the rule in Illinois is that where the evidence admits of only one of the two possible conclusions, *i.e.*, that defendant is either guilty of murder or not guilty by reason of self-defense, a verdict of manslaughter based on a charge not supported by the evidence is prejudicial error. *See, e.g., People v. Gajda*, 87 Ill. App. 316, 232 N.E. 2d 49 (1967). Similarly, in Kentucky it has been held that an instruction on involuntary manslaughter and a resulting conviction thereof is prejudicially erroneous where the evidence supports only a conviction of intentional homicide or an acquittal based upon the justification of self-defense. *Martin v. Commonwealth*, 406 S.W. 2d 843 (Ky. Ct. App. 1966). And in *Parham v. State*, 135 Ga. App. 315, 217 S.E. 2d 493 (1975), the Georgia Court of Appeals used the following language in reversing a verdict of manslaughter unsupported by the evidence: "The evidence here does not *demand* a verdict of murder, and there is evidence of self-defense which would authorize an acquittal. The error is therefore reversible." *Id.* at 318, 217 S.E. 2d at 497. (Emphasis original.)

[4] We emphasize that the result reached here should not be read as casting any doubt on the validity of earlier decisions of this Court or of the Court of Appeals. Our decision today does no more than recognize that a verdict based upon the erroneous submission of a lesser included offense not supported by the evidence does not invariably constitute error favorable to a defendant as a matter of law. Whether such an error is harmless depends instead upon the facts and circumstances peculiar to each case. We hold simply that the facts and circumstances peculiar to the instant case warrant a conclusion that, absent the erroneous submission of involuntary manslaughter, there is a reasonable possibility that the jury would have returned a verdict of acquittal. The error complained of was therefore prejudicial to the defendant. G.S. 15A-1442. As was well stated by the Georgia Supreme Court in *Robinson v. State*, 109 Ga. 506, 34 S.E. 1017 (1900):

"If, in a trial for murder, the law of . . . manslaughter is not involved, the court should not charge thereon; but so doing will not, in such a case, be cause for a new trial, if the accused be rightly convicted of murder, or if, though he be con-

victed of . . . manslaughter only, a verdict of murder was really demanded. If, however . . . there was evidence which would have warranted an acquittal . . . there should be a new trial."

Defendant has, in effect, been acquitted of all degrees of homicide other than involuntary manslaughter. That degree of homicide was not supported by the evidence. We cannot conclude in this case that its erroneous submission was harmless error; therefore the judgment of the trial court must be vacated and the defendant discharged. The decision of the Court of Appeals to the contrary is, consequently,

Reversed.

Justice BROCK did not participate in the consideration and decision of this case.

Justice COPELAND dissenting.

I respectfully dissent because I firmly believe that the decision in this case is controlled by the rule as set forth in *State v. Vestal*, 283 N.C. 249, 195 S.E. 2d 297, *cert. denied*, 414 U.S. 874 (1973), and not as it is set forth and interpreted in the majority opinion.

The majority states that second degree murder and voluntary manslaughter are intentional homicides and that involuntary manslaughter is an unintentional homicide committed in a criminally negligent way. The majority then holds that the trial judge incorrectly defined an intentional killing for second degree murder and voluntary manslaughter as requiring an actual or specific intent to kill so that if the jury did not believe that the defendant had a specific intent to kill, they could have erroneously returned a verdict of the unintentional homicide, involuntary manslaughter. I do not read the instruction given the jury in this case as having required a specific intent to kill.

The jury was instructed that,

"Second degree murder is defined as the unlawful killing of a human being, that is an *intentional killing* of a human being and with malice. you must have unlawful killing. *It*

*must be intentional as I have defined intent to you,* and it must be accomplished with malice. The State must show those elements.

Now voluntary manslaughter is the unlawful killing of a human being without malice. There need be no showing of malice. Voluntary manslaughter, the State must show intent, *must be an intentional killing, but without malice.*

Now involuntary manslaughter is the *unintentional killing* of a human being, by an act *done in a criminally negligent way.*" [Emphasis added.]

The trial judge had already correctly defined intentional killing earlier in his instructions.

Even in the portion of the instructions singled out and quoted in the majority opinion, I do not find that the trial judge required a specific intent to kill. The jury was instructed that,

"Voluntary manslaughter, the State must show intent, *must be an intentional killing,* but without malice.

Now involuntary manslaughter is the *unintentional killing* of a human being, by an act done in a criminally negligent way.

Second degree murder is the unlawful killing of a human being, *that is an intentional killing,* with malice." [Emphasis added.]

From the context of all of the instructions read as a whole, I believe that the jury was fully and adequately instructed on the law regarding second degree murder, voluntary manslaughter and involuntary manslaughter. The trial judge was referring to "intentional killing" in the same manner that the majority did in its opinion and was not erroneously requiring a specific intent to kill.

Furthermore, the majority holds that under the trial judge's instructions the jury could have convicted the defendant of involuntary manslaughter even if it believed that defendant killed in self-defense or defense of a family member since those defenses were submitted only as defenses to an intentional killing (second degree murder and voluntary manslaughter) and not as defenses to an unintentional killing (involuntary manslaughter). To so hold

the majority must have simply ignored the instructions on self-defense and defense of a family member that were given to the jury in this case.

The jury was instructed that,

"And a killing, ladies and gentlemen, *would be excused entirely on the ground of self-defense, or upon the ground of defense of a member of a family*, if . . .

\* \* \*

. . . [I]f after a fair and impartial consideration of all the evidence in the case, *including the evidence of self-defense*, you have a reasonable doubt as to the defendant's guilt of this offense [second degree murder], it would be your duty to give him the benefit of such doubt *and return a verdict of not guilty and acquit him*.

\* \* \*

. . . [I]f after a fair and impartial consideration of all of the evidence in the case, *including the evidence with respect to self-defense or defense of a member of the family*, you have a reasonable doubt as to the defendant's guilt of this offense [voluntary manslaughter]; it would be your duty to give him the benefit of such a reasonable doubt *and return a verdict of not guilty and acquit him*.

Now, if you do not find the defendant guilty, ladies and gentlemen, of the offense of voluntary manslaughter, then you would consider the question of his guilt or innocence of the offense of involuntary manslaughter.

\* \* \*

Now if you do not find the defendant guilty of the offense of murder in the second degree; or of voluntary manslaughter; *but the State has satisfied you from the evidence beyond a reasonable doubt that the defendant did not act in self-defense; then* you must determine whether or not the defendant is guilty of the offense of involuntary manslaughter.

\* \* \*

. . . [I]f after a fair and impartial consideration of *all the evidence* in the case you have a reasonable doubt as to the defendant's guilt of this offense [involuntary manslaughter], it would be your duty to give him the benefit of such doubt *and return a verdict of not guilty and acquit him."* [Emphasis added.]

Therefore, on at least five occasions, the jury was instructed that if it believed that the defendant killed the deceased in self-defense or in defense of a family member, it was to find the defendant *not guilty and acquit him.* I believe that the jury was fully and completely instructed on self-defense and defense of a family member and that the burden of proof on these defenses was correctly placed on the State.

If the jury in this case had believed that defendant killed in self-defense or defense of a family member then it would have been their duty to return a verdict of not guilty. Since the jury found the defendant guilty, it obviously rejected the theories of self-defense and defense of a family member. As stated in a case regarding second degree murder, voluntary manslaughter and self-defense which I believe to be fully applicable here, it was held that,

"His plea of self-defense had been fully and fairly presented to the jury and rejected by them as untrue. What, then, was the duty of the jury, if there was no evidence of manslaughter? Clearly, under the law, they should have convicted the defendant of murder in the second degree. How, then, can the defendant, his plea of self-defense having been wholly discarded by the jury . . . reasonably complain of a charge, however erroneous in that respect, which permitted the jury to convict of a lesser degree of homicide?" *State v. Quick*, 150 N.C. 820, 823-24, 64 S.E. 168, 170 (1909).

It is true that there is no evidence to support a conviction of involuntary manslaughter. However, Willis Rogers, a Wake Forest policeman testified that, "I asked Jimmy Ray where Larry Caudle was and he said he didn't know. He said he emptied his gun when he was crossing the highway. Didn't know whether he hit him or not, but hoped . . . he killed him." This is sufficient evidence to support a conviction of second degree murder. Defendant cannot complain that he has been convicted of a lesser

included offense unsupported by any evidence since there is sufficient evidence to support a conviction of the higher offense. *State v. Vestal, supra.*

Today, for the first time and without being told to what constitutional provision the error relates, we are told that *Vestal* is in effect but an application of the harmless error rule. The majority states that it was harmless error in *Vestal* for the defendant to be convicted of a lesser included offense for which there was no evidence since, in the absence of the unsupported lesser offense as an alternative, it *most certainly would have* returned a verdict of guilty of a higher offense. Then, in the case *sub judice*, the majority does not apply the harmless error test of G.S. 15A-1443(b); instead, it applies the reasonable possibility test of G.S. 15A-1443(a).

There is a difference between the two tests. Error of constitutional proportions is prejudicial unless the State can prove beyond a reasonable doubt that the error was harmless. G.S. 15A-1443(b). Errors arising other than under the Constitution are prejudicial when there is a reasonable possibility that, absent the error, a different result would have been reached at the trial. G.S. 15A-1443(a). Under this subsection the defendant has the burden of showing prejudicial error. The majority does not cite any constitutional provision to which the error of convicting defendant of an offense unsupported by any evidence relates.

In my view, *Vestal* states that the defendant has the burden of showing that the error is prejudicial and this he cannot do even though the offense for which he has been convicted is unsupported by any evidence, when there is sufficient evidence from which a jury could reasonably find the defendant guilty of a higher offense. In *Vestal* it was stated that,

> "[O]ur decided cases follow the majority rule and hold that if the court charges on a lesser included offense when all the evidence *tends to support* a greater offense, the error is favorable to the defendant and he is without standing to challenge the verdict.

*      *      *

The evidence, though circumstantial, *was amply sufficient* to sustain the jury's finding that the defendant was

responsible for the killing of Angelo S. Pennisi." *State v. Vestal, supra* at 252-53, 195 S.E. 2d at 299-300. [Emphasis added.]

Likewise, in *State v. Quick, supra* at 824, 64 S.E. at 170 (1909) it was stated that,

> "The deduction seems to us to be founded in the very logic of the law that evidence which is *amply sufficient to support a conviction* of murder must of necessity *be sufficient* to *sustain a conviction* of manslaughter." [Emphasis added.]

Thus, in *Vestal* and *Quick* the holdings were that there was *sufficient evidence* of the higher offense so that a jury *could* have found defendant guilty of that offense thereby making it *nonprejudicial error* for it to convict him of the unsupported lesser included offense. From the above, it is clear that the real issue is simply the sufficiency of the evidence to go to the jury on the higher offense. If there is sufficient evidence from which a jury *could* find defendant guilty of the greater offense then it is error favorable to him where he has been convicted of a lesser included offense unsupported by any evidence. It is not a question of harmless error and I disagree that there is a reasonable possibility in this case that had the error not been committed a different result would have been reached at the trial. The majority relies on two alleged erroneous areas in the jury instructions to find this reasonable possibility: (1) erroneously instructing the jury that second degree murder and voluntary manslaughter required a specific intent to kill and (2) self-defense and defense of a family member were submitted as defenses to intentional but not an unintentional homicide. For the reasons discussed above and on the record as extensively quoted above, I find no erroneous instructions.

I do not believe that the jury instructions somehow short-circuited the jury's consideration of self-defense and defense of a family member as the majority holds. It appears that the only thing that has been short-circuited is the rule as set forth in *Vestal*. To this unjustifiable erosion of the rule as set forth in *Vestal*, I register my dissent.

Chief Justice BRANCH joins in this dissent.