STATE OF NORTH CAROLINA v. JOSEPH TIMOTHY KEEL

No. 457A91

(Filed 18 December 1992)

1. **Criminal Law § 888 (NCI4th) — State's request for instruction — approval by defendant — sufficient objection to instruction given**

   The State's request at a charge conference for a pattern jury instruction on first degree murder, approved by defendant and agreed to by the court, satisfied the requirements of Appellate Rule 10(b)(2) and preserved for appellate review the propriety of the different instruction actually given by the court.

   **Am Jur 2d, Appeal and Error §§ 533, 673; Homicide § 561; Trial §§ 1173, 1174.**

2. **Homicide § 39 (NCI4th) — first degree murder — specific intent to kill — showing required**

   To show the "specific intent to kill" required to prove first degree murder, the State must show more than an intentional act by the defendant resulting in the death of the victim; the State also must show that the defendant intended for his action to result in the victim's death.

   **Am Jur 2d, Homicide §§ 45, 52.**

3. **Homicide §§ 39, 55 (NCI4th) — specific intent to kill — first degree murder distinguished**

   The "specific intent to kill" requirement is one element which distinguishes first degree murder from second degree

murder and manslaughter, neither of which requires a specific intent to kill.

**Am Jur 2d, Homicide § 45.**

4. **Homicide § 476 (NCI4th) — first degree murder — specific intent to kill — erroneous instruction — prejudicial error**

The trial court's instruction in a first degree murder case that "[t]he phrase intentionally killed refers not to the presence of a specific intent to kill; the sense of the expression is that the act that resulted in death is intentionally committed" erroneously relieved the State of its burden of proving the specific intent required for first degree murder and violated the defendant's right to due process guaranteed by the U.S. Constitution. The State failed to show that the trial court's error in defining the intent required for first degree murder was harmless beyond a reasonable doubt where defendant's mental state at the time of the crime was at issue in the case.

**Am Jur 2d, Homicide §§ 45, 499, 501.**

Justice MEYER dissenting.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a death sentence entered by Brown, J., at the 12 August 1991 Criminal Session of Superior Court, Edgecombe County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court on 5 October 1992.

*Lacy H. Thornburg, Attorney General, by Valerie B. Spalding, Assistant Attorney General, for the State.*

*Thomas R. Sallenger for the defendant-appellant.*

MITCHELL, Justice.

The defendant presented no evidence at the guilt-innocence determination phase of his capital trial. The State's evidence tended to show the following. On 10 July 1990, at about 10 p.m., the defendant, Joseph Timothy "Timmy" Keel, knocked on the door of Albry Thurman's mobile home. When Thurman answered the door, the defendant told him that John Simmons, the defendant's father-in-law, had been shot. The defendant told Thurman that it had been a drive-by shooting. Thurman testified that the defendant's shirt was covered with blood and that Simmons was outside in

a yellow pickup truck, situated in the passenger side so that he faced the steering wheel. Simmons had a bullet wound in the right side of his head, and the truck's windows were rolled down. Albry Thurman's wife, Shelby Thurman, called 911. Shelby Thurman testified that the defendant told her that Simmons had been shot by a person riding in a red station wagon near the dumpsters on Gay Road.

Edgecombe County Sheriff's Deputy Robert Davis testified that he was called to Baker's Park, the trailer park where the Thurmans' mobile home was located, on the night of 10 July 1990. When he arrived, the rescue squad was already there. The defendant came out of the trailer and met Davis in the yard. The defendant told Davis that he had received a phone call earlier in the evening asking him to go to Shell Bank Farm, the hog farm where the defendant worked. The defendant said that Simmons had driven him to the farm. On the way back, while Simmons was driving, someone in a red station wagon or a large Chevrolet had shot Simmons twice when they were at the intersection of Leggett Road and Gay Road. The defendant appeared to be upset, and his shirt was covered with blood. Deputy Davis examined the pickup truck and found that the windows were rolled down. There was a bullet hole just behind the driver's side window, and there was a small pool of blood in the passenger seat near the window.

Sergeant Donnie Lynn of the Edgecombe County Sheriff's Department also interviewed the defendant on the night of the shooting. The defendant told Sergeant Lynn that he and his wife lived with the victim, Johnny Simmons, and that, on the night of the shooting, Simmons had driven the defendant to Shell Bank Farm after the defendant's boss had called to tell him to check on the hogs at the farm. The defendant stated that he had taken the company truck from the driveway of the farm manager's house and had driven that truck down to the farm while Simmons followed in the yellow pickup truck. The defendant said that after he checked out the farm and found nothing wrong, he took the company truck back to the manager's house and left the farm with Simmons in the yellow truck. Simmons was driving. When they were on Gay Road near some trash dumpsters, a car passed them, and the defendant heard two pops. Simmons slumped over, and the defendant managed to stop the truck. The defendant moved Simmons over to the passenger side of the truck and drove the truck away.

On the night of the shooting, the defendant showed Sergeant Lynn where these events allegedly occurred. Sergeant Lynn testified that he found nothing in the vicinity of the Gay Road dumpsters to indicate that a drive-by shooting had occurred. He testified that he returned to the farm the following day, when he noticed what appeared to be blood outside the farm office and found a .22 caliber shell casing nearby. Inside the building, Sergeant Lynn saw blood spatters on the walls and floors and found a jumpsuit with blood on it. He also found a blood-soaked mop at the back of the building, some .22 caliber bullets in a drawer in the office, and a hole in the window screen of the farm office.

Dr. Louis Levy, the medical examiner for Nash and Edgecombe Counties, testified that the victim had suffered two gunshot wounds, that the shots had been fired from a distance, and that they had been fired from opposite sides of the victim's head. He testified that the victim had died of shock as a result of the gunshot wounds. Dr. Levy's opinion was that neither gunshot wound was consistent with a drive-by shooting.

James Stevey, a co-worker of the defendant, testified that he was the first to arrive at work on the day after the shooting. The key that was usually over the front door of the farm's office building was missing, so Stevey went into the building only after the defendant entered by a side door and opened the front door from the inside. This was not the normal practice, and Stevey had never seen the defendant enter the building in this way. Stevey testified that he had noticed a puddle of blood in front of the building and that the defendant had kicked dirt over the puddle. Once they were inside the building, the defendant went ahead of Stevey into the area of the building in which workers changed their clothes. By the time Stevey went in, the defendant was already running the clothes washer. This was unusual, because another employee usually did the washing. The defendant then began wiping blood off the floor with a rag. When Stevey asked what had happened, the defendant told Stevey that the defendant's father-in-law had been shot. Stevey also testified that he saw a bloody mop outside the building and that generally there was no animal blood in the office building, because hogs were not killed at that location.

Lieutenant Jerry Wiggs of the Edgecombe County Sheriff's Department testified that he interviewed the defendant on 13 July 1990 at the office of the Sheriff's Department. After waiving his

rights, the defendant made a statement, recorded in writing by Lieutenant Wiggs and signed by the defendant, in which he admitted that he had shot his father-in-law at the hog farm on 10 July 1990. He stated that he had called the victim and asked for a ride to the farm. When they arrived at the farm, the defendant picked up the farm truck. He then proceeded to the farm building, driving ahead of the victim. The defendant went into the farm building, and from there, he fired a shot into the victim's truck cab. The victim got out of his truck, saying he was hit, and the defendant made him sit down in the kitchen area of the farm building. The defendant stated that he shot the victim again, because the victim had a knife and was coming after him. The victim fell, but got up again, and the defendant helped him get into the truck. The defendant then drove to Baker's Park to get some help. The defendant stated that he had thrown the rifle into one of the fields in the hog pen and that he did not know why he had shot the victim.

Ceclia Edmondson, the defendant's next-door neighbor, testified that on 9 July 1990, the defendant was standing outside Edmondson's house when the victim accused the defendant of being a woman-beater and asked the defendant what kind of drugs he was taking. The defendant stated, "I'm going to kill that bald-headed, mother-f---ing son-of-a-bitch if he doesn't leave me alone." Edmondson testified that the defendant had been drinking and smelled of alcohol when he made this statement.

[1] The defendant assigns as error the trial court's instruction to the jury on the specific intent element of first-degree murder. We conclude that the trial court erred in its instruction on the intent element of first-degree murder, that this error was prejudicial, and that the defendant therefore is entitled to a new trial.

The State specifically requested during a charge conference that the trial court give N.C.P.I.—Crim. 206.13, and the trial court agreed to give the portion of this pattern instruction relating to first-degree murder. When asked by the trial court if he had any objections to the use of this instruction, defendant's counsel replied that he had no objection. Because the State requested this instruction, and the trial court agreed to give it, the defendant's counsel had no reason to make his own request for this instruction. The State's request, approved by the defendant and agreed to by the trial court, satisfied the requirements of Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure and preserved this question

for review on appeal. *See State v. Montgomery*, 331 N.C. 559, 570, 417 S.E.2d 742, 748 (1992); *State v. Ross*, 322 N.C. 261, 265, 367 S.E.2d 889, 891 (1988); *State v. Pakulski*, 319 N.C. 562, 575, 356 S.E.2d 319, 327 (1987).

Although the trial court had agreed to give N.C.P.I.—Crim. 206.13, it actually gave the following instruction on the intent element of first-degree murder:

First degree murder is the unlawful killing of a human being with malice and with premeditation, and deliberation.

For you to find the defendant guilty of first degree murder, the State must prove five things beyond a reasonable doubt.

First, that the defendant, intentionally and with malice, killed Johnny Ray Simmons with a deadly weapon.

*The phrase intentionally killed refers not to the presence of a specific intent to kill; the sense of the expression is that the act that resulted in death is intentionally committed.*

. . . .

The third, that the defendant intended to kill Johnny Ray Simmons.

Intent is a mental attitude seldom provable by direct evidence.

It must ordinarily be proved by circumstances from which it may be inferred.

An intent to kill may be inferred from the nature of the assault; the manner in which it was made; the conduct of the parties; and other relevant circumstances.

(Emphasis added.)

The portion of the trial court's charge defining the phrase "intentionally killed" is not a part of the pattern jury instruction dealing with first-degree murder. Rather, this portion of the trial court's instruction comes from a footnote in the pattern instruction dealing with second-degree murder. This footnote begins with the following language:

"Neither second-degree murder or voluntary manslaughter has as an essential element an intent to kill. In connection with

these two offenses, the phrase 'intentional killing' refers *not* to the presence of a specific intent to kill, but rather to the fact that the *act* which resulted in death is intentionally committed."

N.C.P.I.—Crim. 206.13 n.8 (quoting *State v. Ray*, 299 N.C. 151, 158, 261 S.E.2d 789, 794 (1980) ).

[2]  Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Jackson*, 317 N.C. 1, 23, 343 S.E.2d 814, 827 (1986) (citing *State v. Fleming*, 296 N.C. 559, 251 S.E.2d 430 (1979) ), *cert. granted and judgment vacated on other grounds*, 479 U.S. 1077, 94 L. Ed. 2d 133 (1987); N.C.G.S. § 14-17 (Supp. 1991). The specific intent to kill is a necessary component of deliberation; deliberation requires "an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *Jackson*, (citing *State v. Hamlet*, 312 N.C. 162, 321 S.E.2d 837 (1984); *State v. Bush*, 307 N.C. 152, 297 S.E.2d 563 (1982) ). To show the "specific intent to kill" required to prove first-degree murder, the State must show more than an intentional act by the defendant resulting in the death of the victim; the State also must show that the defendant intended for his action to result in the victim's death.

[3, 4]  The "specific intent to kill" requirement is one element which distinguishes first-degree murder from second-degree murder and manslaughter, neither of which requires a specific intent to kill. The trial court's instruction to the jury in the present case that "[t]he phrase intentionally killed refers not to the presence of a specific intent to kill; the sense of the expression is that the act that resulted in death is intentionally committed," entirely relieved the State of its burden of proving the specific intent required for first-degree murder. While the trial court's instruction would have been correct in an explanation of the intent required for a conviction of second-degree murder or of voluntary manslaughter, the trial court erred in using such a definition of intent in its instruction on first-degree murder.

The trial court's subsequent instruction to the jury that the State must prove "that the defendant intended to kill Johnny Ray Simmons" did not correct this error, because the court already had defined the phrase "intended to kill" as meaning that only

STATE v. KEEL

[333 N.C. 52 (1992)]

the act resulting in death—not death itself—must be intended. Further, even if the subsequent instruction could be interpreted to be correct, and therefore contradictory to the trial court's prior definition of the intent required for first-degree murder, the instructions still would include error requiring a new trial. When two instructions are contradictory, we must presume that the jury followed the erroneous instruction. *State v. Harris*, 289 N.C. 275, 280, 221 S.E.2d 343, 347 (1976); *State v. Carver*, 286 N.C. 179, 183, 209 S.E.2d 785, 788 (1974).

Due process requires that the State prove every element of a crime beyond a reasonable doubt before an accused may be convicted. *In re Winship*, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375 (1970). The trial court's improper instructions on the intent element of first-degree murder in the instant case relieved the State of its burden of proving each element of first-degree murder beyond a reasonable doubt and violated the defendant's right to due process guaranteed by the Constitution of the United States. Therefore, we follow the constitutional harmless error standard set forth in N.C.G.S. § 15A-1443(b) in determining whether the trial court's error was harmless. The State must "demonstrate, beyond a reasonable doubt, that the error was harmless." N.C.G.S. § 15A-1443(b) (1988).

In the present case, the defendant's closing argument emphasized to the jury that the defendant contended that he had lacked the requisite state of mind for first-degree murder. The jury heard evidence of the defendant's statement in which he admitted shooting the victim, but stated that he had no reason to shoot the victim and did not know why he had done so. Several witnesses testified that the defendant attempted to get help for the victim after he had shot him. One of the defendant's co-workers testified that he and the defendant had been drinking after work on the day of the shooting and that the defendant had consumed at least two or three beers. A neighbor of the defendant testified that, although the defendant made threatening comments about the victim after the two of them had argued the day before the shooting, the defendant was drunk at the time. Because the defendant's mental state at the time of the crime was at issue in the present case, the State has failed to show that the trial court's error in defining the intent required for first-degree murder was harmless beyond a reasonable doubt. We conclude that the trial court committed prejudicial error by improperly instructing the jury as to the intent

element of first-degree murder. Therefore, the defendant must receive a new trial.

The State's motion to expand the record is denied.

New trial.

Justice Meyer dissenting.

I concede that the trial court's first-degree murder jury instruction in this case was erroneous and that the error is one of constitutional dimension. However, contrary to the majority, I believe that the evidence against the defendant was so overwhelming that the error was harmless beyond a reasonable doubt.

A violation committed at trial that infringes upon a defendant's constitutional rights is presumed to be prejudicial and entitles defendant to a new trial unless the error committed is harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1988); *Chapman v. California,* 386 U.S. 18, 17 L. Ed. 2d 705 (1967); *State v. Brown,* 306 N.C. 151, 164, 293 S.E.2d 569, 578, *cert. denied,* 459 U.S. 1080, 74 L. Ed. 2d 642 (1982). The overwhelming evidence of guilt may render error of constitutional dimension harmless beyond a reasonable doubt. *Harrington v. California,* 395 U.S. 250, 23 L. Ed. 2d 284 (1969); *State v. Autry,* 321 N.C. 392, 400, 364 S.E.2d 341, 346 (1988).

In *Chapman,* the United States Supreme Court held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman,* 386 U.S. at 24, 17 L. Ed. 2d at 710-11. The Court said that, although "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless, . . . [not] all trial errors which violate the Constitution automatically call for reversal." *Id.* at 23, 17 L. Ed. 2d at 710. An error involving the denial of a federal constitutional right can be deemed harmless in a state criminal proceeding if the reviewing court is satisfied beyond a reasonable doubt that the error complained of did not contribute to the defendant's conviction. *Id.* at 18, 17 L. Ed. 2d at 705.

Applying the foregoing standard to the facts in this case, I have no doubt that the evidence against defendant, even in view of the erroneous instruction given, is so overwhelming that the

error was harmless beyond a reasonable doubt. The impact of the tainted instruction on the mind of an average juror in the face of the overwhelming evidence of guilt was "so unimportant and insignificant" that it must be deemed harmless. *See Chapman*, 386 U.S. at 22, 17 L. Ed. 2d at 709.

First-degree murder is the intentional and unlawful killing of another human being with malice and with premeditation and deliberation. N.C.G.S. § 14-17 (1989); *State v. Bonney*, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991). Premeditation means that the defendant formed the specific intent to kill the victim some period of time, however short, before the actual killing. *State v. Vause*, 328 N.C. 231, 238, 400 S.E.2d 57, 61 (1991). Deliberation means an intent to kill executed by the defendant in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose, and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation. *Bonney*, 329 N.C. at 77, 405 S.E.2d at 154. A specific intent to kill is subsumed within the elements of premeditation and deliberation, and therefore, proof of premeditation and deliberation is also proof of intent to kill. "A specific intent to kill is a necessary constituent of the elements of premeditation and deliberation, and therefore, *proof of premeditation and deliberation is also proof of intent to kill.*" *State v. Thomas*, 332 N.C. 544, 560, 423 S.E.2d 75, 84.

Because premeditation and deliberation relate to processes of the mind, they are rarely susceptible to proof by direct evidence. *State v. Olsen*, 330 N.C. 557, 565, 411 S.E.2d 592, 596 (1992). Some of the circumstances from which an inference of premeditation and deliberation can be drawn are:

> (1) absence of provocation on the part of the deceased, (2) the statements and conduct of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds.

*Id.*

The evidence presented at defendant's trial clearly showed that he committed a murder that was premeditated and deliberated.

First, the victim in no way provoked defendant to commit the crime in question. The victim was asleep in his bed when defendant called the victim's house and asked the victim for a ride to Shell Bank Farm, where defendant worked. After giving defendant a ride to the farm, the victim remained outside in his truck while the defendant went into the office. While sitting in the truck, the victim was shot through the left side of the head by defendant, who was inside the office. The victim managed to get out of the truck and walk into the office. Defendant alleges that the victim then picked up a knife in the kitchen and began to go after the defendant, but no knife was ever found at the scene. Jennifer Simmons, the victim's wife, testified that her husband was not carrying a knife on the night in question and that he never carried a knife. While the victim was in the office, defendant, not content with the fact that the victim already had one bullet in the left side of his head, shot the victim again in the right side of the head in the cheek area. There is no evidence of provocation on the part of the victim in this case.

Second, the evidence presented at defendant's trial showed a ruthless killing committed by a man who had devised an elaborate plan to kill his father-in-law. Ceclia Edmondson testified that on 9 July 1990, she was on the porch of her house, which was next door to the victim's house. Defendant was sitting on the hood of a car in her driveway. Edmondson heard the victim accuse defendant of being a wife beater and ask defendant what kind of drugs he was taking. After the victim went inside his house, defendant stated, "I'm going to kill that bald headed, mother-f---ing-son-of-a-b---- if he doesn't leave me alone."

During work on 10 July 1990, defendant asked Kerney Harrison, a fellow employee, for a ride to work the next day. Defendant had never before asked Harrison for a ride to work because either his mother-in-law or his father-in-law drove him to work in the morning. At approximately 8:00 p.m. on 10 July, defendant called Gary Stambaugh, the manager who lived at the farm, and asked if he could borrow the farm truck to go fishing that night. Defendant then called the victim's house at approximately 9:00 p.m. and asked the victim if he would give him a ride to the farm. Defendant told the victim that the lights had gone out at the farm and that

STATE v. KEEL

[333 N.C. 52 (1992)]

Hanns-Deerter Alhusen, the owner of the hog farm, had called defendant and asked him to check on the farm. As Alhusen later testified, neither he nor anyone else at the farm had called defendant to check on the lights at the farm. Defendant went to the victim's house, and they drove out to the hog farm, which was approximately three-fourths of a mile off of Highway 97. Upon arriving at the farm, defendant had the victim stop at Stambaugh's house so that defendant could pick up the farm truck. It was common knowledge at the farm that a .22-caliber rifle was kept in the farm truck. The victim then followed the defendant, who was in the farm truck, to the farm office. After going into the office, defendant went into the room where the .22-caliber bullets were kept, loaded the rifle, aimed out the window, and shot the victim in the head while the victim was waiting in the truck for the defendant. Defendant's plan to kill his father-in-law was almost successful at that point, but his father-in-law survived the bullet wound to his head and managed to get out of his truck and walk into the office. At this point, defendant again shot his father-in-law in the head. This time he was successful in his plan to kill his father-in-law.

Defendant, in his confession, claimed that he then went to get help for the victim. Defendant claimed that he first drove the farm truck, with the victim following him with two bullets in his head, four-tenths of a mile from the farm office and then left the farm truck there. Defendant then proceeded to take the victim, in the victim's truck, seven to eight miles to the house of defendant's brother, who lives in Baker's Trailer Park. All of defendant's actions were taken under the pretense of wanting to "help" the victim. Yet, defendant knew that Stambaugh lived at the farm house; in fact, defendant talked to Stambaugh that night before taking the farm truck. Defendant made no attempt to get Stambaugh to call for help nor did he himself call for help. Instead, defendant drove to Baker's Trailer Park, and when his brother would not answer the door, he went to Albry Thurman's mobile home and told Thurman that his father-in-law had been the victim of a "drive-by" shooting and had been shot twice. Not only did defendant not seek available help for his father-in-law, he made up a false story as to what had happened on the night in question in order to cover up his crime.

Third, defendant's confession erases any possible doubt as to the lack of premeditation and deliberation on the part of defendant.

STATE v. KEEL

[333 N.C. 52 (1992)]

On 13 July 1990 at 5:40 p.m., defendant made the following signed confession to Detective Donnie A. Lynn with the Edgecombe County Sheriff's Department:

My name is Tim Keel.

I shot my father-in-law at the hog farm July 10, 1990.

I made a phone call to 442-7970. I think John answered.

I told him I had to go to work.

Me and Amy [defendant's wife] were at O'Deh's store on Church Street.

We got back to the house.

My father-in-law and I talked to each other.

We arrived at the hog farm.

I got the farm truck; went ahead of him to unit five hundred.

He parked his truck beside the building.

I went inside the unit and fired a shot into the cab.

The rifle was in the farm truck.

I shot through the window in Johnny's office.

John Simmons [victim] got out of his truck and he was bleeding. He kept saying he was hit.

As he entered the door, I told him [to] sit down in the kitchen area.

I shot again because he had a knife and was coming after me.

He fell down and got up and I helped him into the truck to get him some help.

He got into his truck. He was conscious and kept saying, "Help me. Help me."

I carried him to Baker's Trailer Park and tried to get him some help.

I passed a red car on the way to Baker's Trailer Park.

They were yelling and drinking and riding around.

STATE v. KEEL

[333 N.C. 52 (1992)]

This is where I got the red car descriptions from.

John Simmons [victim] carried me back to the edge of the path where I left the farm truck.

We went back to the hog house on his truck.

I don't know why I did it. I didn't have any reason for shooting him.

I threw the gun in one of the fields in the hog pen.

In addition, on 11 July 1990, SBI Agent Dennis Honeycutt examined the farm office and the area outside the office. He not only observed blood all over the office, but he also performed luminol and phenolphthalein tests to determine the presence of blood not detectable by the human eye. A large bloodstained area was discovered on the ground outside the front door of the office. Honeycutt also observed a .22-caliber shell casing near the bloodstain. Just outside the front door, blood was also observed on a small cement pad. Upon entering the front door of the office, Honeycutt discovered on the floor three cloth strands from a cloth mop; each strand had bloodstains on it. In the dressing room where the employees change for work, there were a series of blood spatters on the wall. Honeycutt testified that "[a] blood spatter is an area of blood that has been acted on by force. The area of blood would be basically in flight. The blood would be moving through the air striking some object and causing a spatter." Bloodstains were also noted in the shower. Honeycutt further found bloodstains on the washing machine in the laundry room, one on top of the washer and another under the lid. Also in the laundry room was a pair of coveralls that had a large bloodstain on the bottom of the pants leg. On the floor near the shower area was a shoe pattern in blood. The door leading from the laundry room into the kitchen also had four blood spatters on it. Blood spatters were also noted on the bottom portion of the refrigerator in the kitchen, as well as on the walls. On the back porch, Honeycutt also observed a cloth mop with bloodstains on it. Further cloth strands with bloodstains on them were also found in the trash can in the kitchen. James Stevey, an employee at Shell Bank Farm, testified that when he left work on 10 July 1990 he did not see any blood in the office.

Furthermore, Dr. Louis Levy, pathologist and medical examiner for Nash and Edgecombe Counties, testified that he conducted an

autopsy of the victim's body on 11 July 1990. Upon external examination, Dr. Levy found bruises, contusions, abrasions, and lacerations on the left side of the body. In addition, there were two gunshot wounds to the head. One gunshot wound was in the right cheek at ear level and was identified as an entrance wound. There was a second entrance wound behind the left ear. The two bullet paths came from opposite sides of the head. Dr. Levy testified that, in his opinion, both bullets that struck the victim were fired from a distant range.

Finally, defendant clearly tried to cover up the fact that he had committed a murder. After shooting his father-in-law, defendant went to Albry Thurman's mobile home and told Thurman that the victim had been shot during a drive-by shooting. Shelby Thurman corroborated her husband Albry's testimony, adding that defendant stated that the drive-by shooting had occurred from a red station wagon at the Gay Road dumpsters.

Deputy Robert Davis with the Edgecombe County Sheriff's Department testified that he went to the Thurmans' mobile home and talked to defendant on the night in question. Defendant told Davis that earlier in the evening he had received a phone call to go to Shell Bank Farm. Defendant's father-in-law, the victim, drove defendant out to the farm; on the way back, with the victim driving, defendant stated that someone in a red station wagon had shot the victim twice near the intersection of Leggett Road and Gay Road.

Sergeant Donnie Lynn also interviewed defendant at the mobile home. Defendant told Lynn a similar story but added that when he and the victim passed the red station wagon, defendant heard two pops, after which the victim slumped over and defendant managed to stop the truck. Defendant stated that he managed to pull the victim over to the passenger side of the truck and that he then drove the truck to Baker's Trailer Park. Lynn testified that defendant showed him where all of these events occurred but that they did not go inside the farm office because defendant said it was locked and he did not have a key.

James Stevey, an employee at Shell Bank Farm, testified that on 11 July 1990, the day after the murder, he noticed a puddle of blood in the sandy gravel in front of the office door. He stated that when defendant stepped outside the front door of the office,

defendant went straight to the puddle of blood and kicked soil over it. Defendant said nothing while he did this.

Ceclia Edmondson testified that she went to the hospital the night that the victim was shot. While at the hospital, Edmondson saw defendant, who stuck his bloodied shirt in her pocketbook. She took the shirt home and washed it for him.

In conclusion, although I concede that the trial court erred in its first-degree murder instruction to the jury, I strongly believe that the trial court's error was harmless beyond a reasonable doubt. The evidence presented at trial could leave no doubt in any reasonable juror's mind that defendant committed a murder with premeditation and deliberation; therefore, defendant had the necessary specific intent to commit first-degree murder. It is for this reason that I dissent from the majority's opinion.

Justice Lake joins in this dissenting opinion.