STATE OF NORTH CAROLINA v. DOUGLAS CHARLES LePAGE

No. COA09-842

(Filed 18 May 2010)

**1. Evidence— prior crimes or bad acts—harmless error**

Even assuming *arguendo* that the trial court erred in a sexual offense case by admitting evidence of defendant's prior sexual actions, the error was harmless where there was overwhelming evidence of defendant's guilt in this case.

2. **Appeal and Error— preservation of issues—jury instructions**

Defendant properly preserved for appellate review his argument that the trial court erred in its instruction to the jury concerning the use of N.C.G.S. § 8C-1, 404(b) evidence because defendant requested a jury instruction from N.C.P.I.-Crim 104.15 at the charge conference.

3. **Criminal Law— jury instructions—404(b) evidence—harmless error**

Even if the trial court erred in instructing the jury regarding the proper use of evidence admitted under N.C.G.S. § 8C-1, Rule 404(b), given the overwhelming evidence of defendant's guilt of the charged sexual offenses, there existed no reasonable possibility that a different result would have been reached had the error not been made.

4. **Criminal Law— jury instructions—first-degree sexual offense—supported by the evidence**

The trial court did not commit plain error in its instruction to the jury on first-degree sexual offense because the evidence was sufficient to support the trial court's instruction.

5. **Drugs— indictments fatally flawed—no subject matter jurisdiction**

Defendant's convictions for delivery of a controlled substance and contaminating food with a controlled substance were vacated where the indictments for the offenses were fatally flawed. The indictments alleged that the controlled substance used by defendant was "benzodiazepines, which is included in Schedule IV of the North Carolina Controlled Substances Act[,]" but benzodiazepines are not listed in Schedule IV and there exist derivatives of the benzodiazepine category of drugs that are not listed under Schedule IV.

Appeal by Defendant from judgments entered 3 October 2008 by Judge C. Philip Ginn in Superior Court, Macon County. Heard in the Court of Appeals 27 January 2010.

*Attorney General Roy Cooper, by Assistant Attorney General Kevin Anderson, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Anne M. Gomez, for Defendant-Appellant.*

McGEE, Judge.

Douglas Charles LePage (Defendant) was indicted on 2 April 2007 for statutory sex offense, delivering a controlled substance to a minor, indecent liberties with a minor, two counts of contaminating food with a controlled substance, and possessing a controlled substance with the intent to deliver. A jury found Defendant guilty as charged. Defendant was sentenced to consecutive sentences of 238 to 295 months, 64 to 86 months, 16 to 20 months, and 6 to 8 months, in prison. Defendant appeals.

The evidence at trial tended to show that Defendant was acquainted with JBS, the fourteen-year-old daughter of a friend. Defendant and his wife, Karen Smith (Smith), asked JBS's parents if JBS could spend the night of 6 January 2007 at their home. Defendant intended for JBS to help him make a collage for Smith who was depressed because her daughter was not home for the holidays. JBS's parents agreed.

Defendant picked JBS up at 6:00 p.m. on 6 January 2007 and brought her to his house. Defendant, Smith, and JBS ate dinner together. Smith left the house for an 8:00 p.m. meeting, and Defendant and JBS worked on the collage. Smith returned to the house at 9:15 p.m. Defendant and JBS gave Smith the collage, and the three then watched a movie in the master bedroom.

At trial, JBS testified that Defendant served Smith and JBS portions of a banana cream pie around 10:00 p.m. JBS did not want to eat the pie, but Defendant repeatedly encouraged her to do so. JBS noticed that one bite of the pie was "very, very salty[,]" though the rest of her portion was very sweet. Shortly after eating, Smith and JBS fell asleep. JBS awoke during the movie and went to the guest bedroom. JBS said it was unusual for her to fall asleep so early in the evening.

Defendant came into the guest bedroom at some point during the night and told JBS that Smith's snoring was keeping him awake. He told JBS he usually came into the guest bedroom if Smith's snoring was bothering him. JBS offered to move to the other guest bedroom, but Defendant said, "[n]o, no, it's okay[.]" Defendant kissed JBS on the mouth and told her she was "a good kisser."

JBS "remember[ed] a hand going down into [her] pants and then [she] felt something weird going up into [her] body." JBS felt "something funky that [she] had never felt before," and felt Defendant's

hand "on [her] skin." JBS then "blacked out" and she remembered nothing else that occurred that evening. She was not aware of anything being wrong with her private area before going to Defendant's house for the night.

JBS's father testified that JBS was supposed to return home by 9:00 a.m. on 7 January 2007. JBS's father reached Defendant by telephone and Defendant told him that Smith was sick. JBS's father went to Defendant's house to pick up JBS. When he picked up JBS, she was lethargic and her speech was slurred. She was unable to tie her own shoes and could not control her movements. While in the car, JBS was "blurting . . . statements out." She said, "[h]e kissed me[,]" "[h]is tongue was so big[,]" and "I felt his hand." JBS's father then took her to the Macon County Sheriff's office.

Macon County Sheriff Robert Holland (Sheriff Holland) testified that JBS stated that she went to sleep in the guest room and woke up with Defendant lying in bed next to her. Defendant rolled over to her side of the bed and "started putting his hand around" her vaginal area and "would rub fast and quick, going back and forth." JBS told Sheriff Holland that "she [was] not sure what sex is, but she thinks that they had sex . . . . because their tongues were in each other[.]" Sheriff Holland arranged an appointment for JBS later that day with Dr. Jennifer Brown (Dr. Brown), a pediatrician at "Kid's Place, [the] local child advocacy center."

Dr. Brown testified that she performed an evaluation on JBS on 7 January 2007 and found that JBS was "clearly impaired." JBS had abrasions and swelling in and around her vaginal and anal areas. There was a "crusty discharge" on her pubic hair, and a fresh laceration in JBS's posterior fourchette. The area around her anus was red and there was a new laceration there as well. JBS had three linear marks on her right arm, a puncture mark on the inside of her left arm, a bruise on her neck, and markings on her breasts. JBS was unsteady, her speech was slurred, and she appeared to be intoxicated.

JBS told Dr. Brown that one bite of the pie had tasted differently from the rest of the pie; that Defendant had gotten into bed with her, kissed her, and rubbed her vaginal area and breasts. Dr. Brown opined that JBS's "posterior fourchette and anal lacerations . . . . [were] consistent with [JBS's] history and with penetrating injury." Dr. Brown testified that, during her examination of JBS' genital area, JBS had fallen asleep. When Dr. Brown touched JBS' genital region, JBS cried out in pain, despite being asleep.

Smith testified that she fell asleep during the movie and slept until 2:00 p.m. the next day. When Smith awoke the next day, she felt "[w]oozy [and] nauseous[,]" and she vomited. A friend came to Smith's house and took her to the hospital, where Smith displayed symptoms similar to those of JBS. Smith returned home on 8 January 2007 and asked Defendant what had happened. Defendant at first blamed Smith's symptoms on the dinner they had eaten the prior evening, but then told Smith he had put drugs in the pie so that he and Smith could have "a relaxing sexual experience." Defendant said that JBS must have gotten the drugged pie by mistake. Smith also testified that Defendant had received a package containing "[c]lonazepam or pine, one of the two" a few days earlier.

Smith told Defendant to leave the house. Defendant left and went to visit his female cousin, L.E., in Ohio. Defendant then went to Miami and returned to North Carolina near the end of January 2007. Smith also testified that, after returning home from the hospital, she found sex toys in a bag under a bed in her house. Smith had never seen these implements before and thought the bag and the toys had "left with [Defendant] when he left [for Ohio]."

Sheriff Holland first questioned Defendant on 7 January 2007. Sheriff Holland testified that Defendant stated that he sometimes slept in the guest bedroom and masturbated there. Sheriff Holland also interviewed Defendant on 29 January 2007. Defendant admitted to Sheriff Holland that he had put medication in the pie, and had kissed JBS and touched her breasts. Defendant said the use of medication prior to sexual activities was common between him and Smith. Defendant told Sheriff Holland that Smith did not want to know the medication was in the pie on 6 January 2007, and that he did not purposefully drug JBS.

Special Agent Aaron Joncich of the State Bureau of Investigation (Agent Joncich) testified that he tested samples of JBS's urine and the "test indicated the presence of a class of drugs called [b]enzodiazepines." Agent Joncich testified that JBS's urine contained a "metabolite of Clonazepam[,]" a drug used as a sleep aid which can cause "anterograde amnesia[.]" He testified that anterograde amnesia "means after you take that drug you forget things during the activity of that drug in your body." Davis Speed, a medical technologist at Angel Medical Center, testified that he also found the presence of benzodiazepines in Smith's urine.

Defendant presented evidence through his own testimony. He testified that he placed "benzodiazepine" in the banana cream pie, but

only drugged the piece he served to Smith. When JBS went to the guest bedroom to change for bed, he followed her. When Defendant and JBS were making the collage earlier in the evening, JBS had told Defendant that she was worried she was not a good kisser. Defendant kissed JBS in the guest bedroom and told her she was a good kisser. Defendant stayed in the room for less than ten minutes and then went back to the master bedroom where they finished watching the movie and Defendant fell asleep next to Smith. Defendant did not leave the master bedroom again until morning. Defendant also denied having put his hand in JBS's pants and testified that, if JBS was injured, the injuries occurred before she came to his house.

### 404(b) Evidence

At trial, the State presented the following evidence pursuant to N.C. Gen. Stat. § 8C-1 Rule, 404(b). First, the trial court offered the testimony of B.E. B.E. testified that in July 2006, when she was sixteen years old, she met Defendant at an Alcoholics Anonymous meeting. Within a few months of becoming friends with Defendant, Defendant began to discuss his sexual problems with B.E. Defendant told her that he could no longer have sex because he had injected drugs into his groin. However, Defendant told B.E. that he could "make [B.E.] feel like a woman, meaning perform oral sex [on her], touch [her], protrude [sic] [her] in other ways." Defendant told B.E. that he did not have a problem with her age because "it's legal in North Carolina." B.E. ended her relationship with Defendant because she "got scared." Defendant contends that the "trial court erred in admitting this evidence because it was not sufficiently similar to the charged offenses."

The State also presented a videotape displaying sexual activity involving Defendant and his female cousin, L.E. The video was taken during the time Defendant left his home and went to stay with L.E. in Ohio. In the video, Defendant can be seen inserting objects into L.E.'s vagina. L.E. did not appear to be conscious during the activity, and she testified at trial that she did not remember the activity. L.E. also testified that she did not consent to the activity and that she remembered being ill and vomiting during Defendant's visit.

### The B.E. Evidence

[1] Defendant first argues that the trial court erred in admitting evidence of Defendant's prior actions with B.E. Defendant contends that our Court reviews a trial court's ruling on the relevance of evidence *de novo*. However, we review a trial court's ruling on the admissibil-

ity of evidence pursuant to N.C. Gen. Stat. § 8C-1, Rule 404(b)for an abuse of discretion. *State v. Summers*, 177 N.C. App. 691, 697, 629 S.E.2d 902, 907 (2006).

N.C. Gen. Stat. § 8C-1, Rule 404(b) provides in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (2009). Our Supreme Court has held that

> Rule 404(b) "state[s] a clear general rule of inclusion of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but one exception requiring its exclusion if its only probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged."

> Rule 404(b) evidence, however, should be carefully scrutinized in order to adequately safeguard against the improper introduction of character evidence against the accused.

*State v. Al-Bayyinah*, 356 N.C. 150, 154, 567 S.E.2d 120, 122 (2002) (quoting *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990)) (emphasis omitted). Evidence offered under Rule 404(b) must be analyzed focusing on "the requirements of similarity and temporal proximity." *Id.*, 567 S.E.2d at 123.

Even assuming, *arguendo*, that the trial court did commit error, we find that such error would be harmless. " 'The party who asserts that evidence was improperly admitted usually has the burden to show the error and that he was prejudiced by its admission.' . . . Evidentiary errors are harmless unless a defendant proves that absent the error a different result would have been reached at trial." *State v. Ferguson*, 145 N.C. App. 302, 307, 549 S.E.2d 889, 893, *disc. review denied*, 354 N.C. 223, 554 S.E.2d 650 (2001) (citations omitted).

Excluding B.E.'s testimony, the evidence at trial tended to show: (1) Defendant admitted to having drugged Smith and JBS; (2) Defendant admitted to having kissed JBS and having touched her breasts; (3) the videotape showed Defendant using sex toys with an

apparently drugged L.E.; (4) L.E. testified that she had not consented to the actions shown on the videotape and that she did not remember engaging in those actions; (5) JBS's medical exams showed the presence of the drugs Defendant admitted to applying to the pie; (6) Smith found sex toys that she had previously not known about under Defendant's side of their bed; (7) those sex toys went missing at the same time Defendant left to go to Ohio to stay with L.E.; (8) Smith had earlier found a package addressed to Defendant which contained "Clonazepam or Pine[;]" (9) JBS's urine sample contained a metabolite of Clonazepam, indicating that she had recently ingested that drug; and (10) Smith's urine also showed the presence of one of a class of drugs that includes Clonazepam.

We find that there was overwhelming evidence of Defendant's guilt and that the admission of evidence of Defendant's proposition to B.E. would have no probable impact on the jury's decision. *See State v. Zinkand*, 190 N.C. App. 765, 771, 661 S.E.2d 290, 293 ("Additionally, in light of the overwhelming evidence, as detailed earlier, of defendant's guilt, defendant cannot show prejudice in the trial court's admission of the challenged evidence as it would have no probable impact on the jury's decision."), *disc. review denied*, 362 N.C. 513, 668 S.E.2d 783 (2008). We therefore find no prejudicial error as to this issue.

*Jury Instructions*

**[2], [3]** Defendant argues that the trial court erred in instructing the jury that it might consider certain evidence admitted, pursuant to N.C.G.S. § 8C-1, Rule 404(b), for the purpose of showing "the unnatural disposition of [Defendant] to commit one or more of the crimes with which he is charged." Specifically, Defendant contends that the jury was allowed to consider B.E.'s testimony and the videotape for an improper purpose.

Defendant requested a jury instruction from N.C.P.I.-Crim 104.15. The trial court granted Defendant's request, and gave the following instruction:

> In addition, ladies and gentlemen, evidence has been received during the course of this trial which tends to show evidence that . . . [D]efendant had attempted a relationship with a witness, [B.E.], and also that there were some acts which were depicted in the video. This evidence has been received for certain purposes. This type of evidence, ladies and gentlemen, of prior acts of . . .

[D]efendant or intended acts of . . . [D]efendant are accepted for the purpose of showing that . . . [D]efendant had a motive for the commission of the crime or crimes charged in this case; that . . . [D]efendant had the intent, which is a necessary element, of the crimes in this case; that . . . [D]efendant had the knowledge which is a necessary element of the crime which is charged in this case; that . . . [D]efendant had the—that there existed in the mind of . . . [D]efendant a plan, a scheme, a system or design involving the crimes which have been alleged in these cases before you; that . . . [D]efendant had the opportunity to commit the crime and the absence of mistake or accident. *And in addition they have been admitted to show, if you in fact find that they do, the unnatural disposition of . . . [D]efendant to commit one or more of the crimes with which he's charged.*

(Emphasis added). Defendant did not object to the instructions after they were given. Defendant assigns error specifically to that portion of the instruction concerning Defendant's "unnatural disposition." We note that this language is not contained within the main text of N.C.P.I.—Crim. 104.15, but instead derives from footnote 1 to the pattern instruction. *See* N.C.P.I.—Crim. 104.15 (2008).

We must first address whether this argument is properly before us. Defendant contends that this argument was preserved for review because "[a] request for an instruction at the charge conference sufficiently complies with Rule 10(b)(2) to preserve the error for appeal where the requested instruction is promised but is not given as was agreed upon." Defendant relies on *State v. Keel*, 333 N.C. 52, 423 S.E.2d 458 (1992), wherein the defendant was charged with first-degree murder. In that case, the State specifically requested that the trial court give the portion of N.C.P.I.—Crim. 206.13 relevant to first-degree murder and the defendant did not object. *Keel*, 333 N.C. at 56, 423 S.E.2d at 461. The trial court then gave the requested instruction, but included language from a footnote of N.C.P.I.—Crim. 206.13, which was relevant only to second-degree murder or manslaughter charges. *Id.* at 57, 423 S.E.2d at 461-62.

Our Supreme Court held that "[t]he State's request, approved by the defendant and agreed to by the trial court, satisfied the requirements of Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure and preserved this question for review on appeal." *Id.* at 56, 423 S.E.2d at 461; *see also State v. Ross*, 322 N.C. 261, 265, 367 S.E.2d 889, 891 (1988) ("[A] request for an instruction at the charge conference is sufficient compliance with the rule to warrant our full

review on appeal where the requested instruction is subsequently promised but not given, notwithstanding any failure to bring the error to the trial judge's attention at the end of the instructions.").

In *Keel*, the State requested, by number, a portion of a specific instruction from the pattern jury instruction and the trial court diverged from that request by using additional language from a portion of the pattern instruction that was neither specifically requested nor legally correct or relevant. *Keel*, 333 N.C. at 56-57, 423 S.E.2d at 461-62. Also in *Ross*,

> [the] defendant requested, and the trial judge indicated he would give, a jury instruction concerning defendant's decision not to testify in his own defense at trial. Yet, the transcript reveals, and the parties agree, that for whatever reason—perhaps the tension associated with any capital murder trial—the trial judge neglected to give the requested and promised jury instruction.

*Ross*, 322 N.C. at 264, 367 S.E.2d at 891.

We next compare these cases to the facts before us. In the present case, Defendant requested the "jury be instructed in accord with N.C.P.I.—Crim. 104.15-EVIDENCE OF SIMILAR ACTS OR CRIMES." In light of *Keel* and *Ross*, Defendant's request "satisfied the requirements of Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure and preserved this question for review on appeal." *Keel*, 333 N.C. at 56, 423 S.E.2d at 461.

> A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises."

N.C. Gen. Stat. § 15A-1443(a) (2009). Assuming, *arguendo*, that the trial court committed error by including the additional language in its jury instruction, we find there is no reasonable possibility that a different result would have been reached at trial had the questioned language not been included.

Considering the overwhelming evidence reviewed above, we find that the requested instruction would have had little effect. If the trial court had instructed the jury with only the text of N.C.P.I.—Crim. 104.15, and had not included the language from footnote 1, the jury would have been allowed to consider the videotape and B.E.'s testi-

mony only for the limited purposes of finding common identity, motive, intent, common plan or scheme, opportunity, knowledge, lack of mistake, lack of entrapment, or the absence of accident. *See* N.C.P.I.—Crim. 104.15. In light of the substantial evidence against Defendant, there existed no reasonable possibility that a different result would have been reached had only the requested instruction been given. We therefore find no prejudicial error as to this issue.

### *First-Degree Sex Offense*

**[4]** Defendant also argues that the trial court erred in that its instruction to the jury on first-degree sex offense allowed the jury to convict on an unsupported theory. Specifically, Defendant contends that the instruction given allowed the trial court to find Defendant guilty based on anal penetration, which was a theory unsupported by the evidence at trial. Defendant did not object to this portion of the instruction at trial and, on appeal, argues that the error constituted plain error.

In order for a trial court to instruct the jury on a particular theory of guilt, that theory must be supported by both the indictment and the evidence presented at trial. *State v. Tucker*, 317 N.C. 532, 540, 346 S.E.2d 417, 422 (1986). An instruction which allows a jury to convict a defendant on a theory of guilt unsupported by either the evidence presented, or the indictment, may rise to the level of plain error. *Id.* We review the evidence to determine whether, when taken in the light most favorable to the State, it warrants the trial court's giving the instruction to the jury. *State v. Grooms*, 353 N.C. 50, 80-81, 540 S.E.2d 713, 732 (2000) ("These facts, taken in the light most favorable to the State, permit an inference that defendant had a consciousness of guilt and took steps, albeit unsuccessful, to avoid apprehension. Thus, the trial court's jury instruction on flight was justified."); *see also State v. Rouse*, —— N.C. App. ——, 679 S.E.2d 520 (2009).

In the case before us, the trial court give the following instruction to the jury:

For you to find . . . [D]efendant guilty of this particular crime the State has to prove four things to you beyond a reasonable doubt.

Number 1, that . . . [D]efendant engaged in a sexual act with a victim. As it applies to the facts of this case, ladies and gentlemen, a sexual act means any penetration, however slight, by any object into the genital or anal opening of a person's body.

The second thing the State has to prove to you: that at the time of the acts the victim was fourteen years old.

The third thing that the State has to prove to you, ladies and gentlemen: that at the time of the acts . . . [D]efendant was at least six years older than the victim—that . . . [D]efendant was six years older than the victim.

The fourth thing that they have to prove to you: that at the time of the acts . . . [D]efendant was not lawfully married to the victim. I believe that is conceded by both sides to be understood in this particular case, but that is an element of the crime.

If you find from the evidence beyond a reasonable doubt that on or about the alleged date . . . [D]efendant engaged in a sexual act with the victim who was fourteen years of age, that . . . [D]efendant was at least six years older than the victim and that they were not married, it would be your duty to return a verdict of guilty.

Thus, the jury instruction allowed the jury to convict Defendant on a theory of statutory sex offense predicated on anal penetration.

The evidence at trial tended to show that JBS felt nothing out of the ordinary in her "private area" prior to arriving at Defendant's house on 6 January 2007. Defendant drugged a pie which he served to Smith and JBS. Defendant then came into JBS' room during the night and kissed her and touched her breasts. JBS testified that she felt Defendant's hand go "down into [her] pants" and "up into [her] body." JBS drifted in and out of consciousness and was under the influence of a chemical that causes anterograde amnesia. The next morning, she had a fresh anal laceration that was so sensitive that it caused her to cry out in pain when a doctor was examining the area. Taken in the light most favorable to the State, we find this evidence sufficient to support the trial court's instruction on anal penetration. We therefore overrule this assignment of error.

### Indictments

[5] Defendant next argues that the indictments for delivery of a controlled substance and contaminating food or drink with a controlled substance were fatally flawed. The indictment for delivery of a controlled substance to a minor charged Defendant with "delivering a controlled substance, BENZODIAZEPENES, which is included in Schedule IV of the North Carolina Controlled Substances Act, to

[JBS][.]" The indictment for contaminating food or drink with a controlled substance charged Defendant with "CONTAMINAT[ING] a Banana Cream Pie with a controlled substance, namely BENZODIAZEPINES, which is included in Schedule IV of the North Carolina Controlled Substances Act." Defendant contends that, because "benzodiazepines" is not listed in Schedule IV of the North Carolina Controlled Substances Act, these indictments are fatally flawed and the convictions must be vacated. We agree.

A felony conviction must be supported by a valid indictment which sets forth each essential element of the crime charged. *State v. Westbrooks*, 345 N.C. 43, 57, 478 S.E.2d 483, 492 (1996); *State v. Sturdivant*, 304 N.C. 293, 308, 283 S.E.2d 719, 729 (1981). A challenge to the facial validity of an indictment may be brought at any time, and need not be raised at trial for preservation on appeal. *Sturdivant*, 304 N.C. at 308, 283 S.E.2d at 729. Defendant relies on our opinions in *State v. Ahmadi-Turshizi*, 175 N.C. App. 783, 625 S.E.2d 604 (2006) and *State v. Ledwell*, 171 N.C. App. 328, 614 S.E.2d 412 (2005).

We begin by noting that "when an indictment is alleged to be facially invalid, thereby depriving the trial court of its jurisdiction, it may be challenged at any time, notwithstanding a defendant's failure to contest its validity in the trial court." *State v. Call*, 353 N.C. 400, 429, 545 S.E.2d 190, 208 (2001) (citations omitted). In *Ledwell*, our Court addressed the question of whether "the trial court lacked jurisdiction on [a] charge of felonious possession of a controlled substance because the indictment was facially insufficient in failing to allege a substance listed in Schedule I." *Ledwell*, 171 N.C. App. at 331, 614 S.E.2d at 414. Discussing the requirements of a valid indictment, we noted that the "[i]dentity of a controlled substance allegedly possessed is . . . an essential element[,]" and must be set forth in order for an indictment to stand. *Id.*

Comparing the indictment in *Ledwell* with the language contained in Schedule I of the Controlled Substances Act, our Court noted: "In the case *sub judice*, the indictment alleged possession of '[m]ethylenedioxyamphetamine (MDA), a controlled substance included in Schedule I of the North Carolina Controlled Substances Act.' No such substance, however, appears in Schedule I." *Id.* at 332, 614 S.E.2d at 415. We then conducted the following review of similar cases arising in other jurisdictions:

> In a similar case, *United States v. Huff*, 512 F.2d 66 (5th Cir.1975), the defendant was charged with two crimes: distribution of "3,4

methylenedioxy amphetamine," a controlled substance pursuant to a statutory schedule of controlled substances, and possession of "methylenedioxy amphetamine," which was not listed on the statutory schedule of controlled substances. The Fifth Circuit stated that while "[t]he addition of the numbers '3,4' would have indeed saved this count, . . . we cannot regard this defect as a mere technicality, for the chemical and legal definition of these substances is itself technical and requires precision." *Id.* at 69. The Fifth Circuit held that the second count failed to charge an offense and reversed the defendant's conviction. In contrast, in *Rogers v. State*, 599 So.2d 930 (Miss. 1992), the Supreme Court of Mississippi upheld an indictment that charged a defendant with distribution of "crystal methamphetamine." Notably, however, the Mississippi controlled substance statute explicitly included as controlled substances "[a]ny substance which contains any quantity of methamphetamine, including its salts, isomers, and salts of isomers[.]" *Id.* at 933 (emphasis omitted) (quotation omitted). North Carolina's Schedule I, in contrast, does not include any substance which contains any quantity of "methylenedioxyamphetamine (MDA)."

*Id.* at 332-33, 614 S.E.2d at 415. Our Court concluded that, because "the substance listed in [the d]efendant's indictment does not appear in Schedule I of the North Carolina Controlled Substances Act[,] . . . the indictment must fail, and [the d]efendant's conviction of felonious possession of '[m]ethylenedioxyamphetamine (MDA)[ ]' [must be] vacated." *Id.* at 333, 614 S.E.2d at 415. *See also Ahmadi-Turshizi*, 175 N.C. App. at 786, 625 S.E.2d at 606 ("As the substance listed in defendant's indictment does not appear in Schedule I of our Controlled Substances Act, the indictment is fatally flawed and each of defendant's convictions . . . must be vacated.").

In the case before us, the challenged indictments contained the following language:

I . The jurors for the State upon their oath present that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully, and feloniously did

CONTAMINATE a Banana Cream Pie with a controlled substance, namely BENZODIAZEPINES, which is included in

Schedule IV of the North Carolina Controlled Substances Act, that was meant to render [Smith] physically helpless.

II. And the jurors for the State upon their oath present that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully, and feloniously did

KNOWINGLY POSSESS with the intent to deliver or possess a controlled substance, namely BENZODIAZEPINES, as defined in G.S. 90-87(5) for the purpose of violating this section. G.S. 14-401.16(b)

And:

I . The jurors for the State upon their oath present that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully, and feloniously did

violate G.S. 90-95(a)(1) by delivering a controlled substance, BENZODIAZEPINES, which is included in Schedule IV of the North Carolina Controlled Substances Act to [JBS], a person under 16 years old but more than 13 years old, namely 14. The defendant was at least eighteen years old or older at the time of the offense.

. . .

II. And the jurors for the State upon their oath present that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully, and feloniously did

contaminate Banana Cream Pie with a controlled substance, namely Benzodiazepines, which is included in Schedule IV of the North Carolina Controlled Substances Act, that was meant to render [JBS] physically helpless.

Schedule IV of the Controlled Substances Act is contained within N.C. Gen. Stat. § 90-92 (2009). N.C.G.S. § 90-92 contains language enumerating forty-nine "[d]epressants"; ten "[s]timulants"; two "[n]arcotic [d]rugs"; and six more chemicals either listed individually or under the heading: "Other [s]ubstances." N.C.G.S. § 90-92. Not one of these categories, nor any of the enumerated substances, contains the term "benzodiazepines."

In discussing the nature of benzodiazepines, Agent Joncich testified at trial that: "Benzodiazepines are a class of drugs with a similar chemical structure . . . . There's well over twenty different [b]enzodiazepine type drugs." He further stated that: "Most of the [b]enzodiazepines fall under Schedule IV of the North Carolina General Statutes." Agent Joncich testified that "Clonazepam" is the generic name for a drug marketed as Klonopin, and that Clonazepam is a benzodiazepine.

The Attorney's Dictionary of Medicine and Word Finder defines "benzodiazepines" as: "A group of drugs whose properties are somewhat similar to those of barbiturates but which are much superior. . . . The most familiar examples of this group are chlordiazepoxide (better known by the brand name Librium) and diazepam (brand name: Valium)." 1 J.E. Schmidt, MD, Attorneys' Dictionary of Medicine and Word Finder B-70, B-71 (2008). The Comprehensive Textbook of Psychiatry, third edition, discusses "the benzodiazepine derivatives" as follows:

> The first of the benzodiazepine derivatives, synthesized in 1957, was chlordiazepoxide. Six additional derivatives of that class are now available in the United States: diazepam, oxazepam, clorazepate, lorazepam, prazepam, and flurazepam. Other benzodiazepines are available on foreign markets and are undergoing study in the United States and elsewhere.

3 Harold I. Kaplan et al., *Comprehensive Textbook of Psychiatry/III* 2317 (3rd. Ed. 1980). Likewise, the Attorney's Illustrated Medical Dictionary defines "benzodiazepine" as "the parent compound of a group of widely prescribed minor tranquilizers used to treat anxiety and neuroses." Ida G. Dox, Ph.D., et al., Attorney's Illustrated Medical Dictionary B9 (1997). Thus, the term "benzodiazepine" describes a class of drug which encompasses a number of individual drugs. There is not a drug called simply "benzodiazepine;" rather, there exist several drugs, including Clonazepam, Diazepam, Pramazepam and others, all of which fall within the class of benzodiazepines.

The State argues that the indictment was not fatally flawed because, though "benzodiazepines" does not appear in Schedule IV, an indictment must merely "apprise[] . . . [D]efendant of the charge against him with enough certainty to allow him to prepare his defense[.]" The State relies on *State v. Newton*, 21 N.C. App. 384, 204 S.E.2d 724 (1974). In *Newton*, our Court held that an indictment was sufficient even though it charged a defendant with possession of

"Desoxyn[,]" which was a substance not listed in the controlled sub-
stances act. *Newton,* 21 N.C. App. at 386, 204 S.E.2d at 725-26. Under
the facts of *Newton,* our Court held that the indictment was sufficient
because "Desoxyn" and "Methamphetamine" were "the same thing."
*Id.* at 386, 204 S.E.2d at 725. We noted that:

> Each of the Schedules of the Controlled Substances Act provides
> that it "includes the controlled substance listed or to be listed by
> whatever official name, common or usual name, chemical name,
> or trade name designated." We take notice that Desoxyn is a trade
> name used by Abbott Laboratories, North Chicago, Illinois, for
> methamphetamine hydrochloride.

*Id.*

The State contends that "in essence, [b]enzodiazepines and
Clonazepam are the same thing. At the very least, [b]enzodiazepines
is a 'common' name for Clonazepam." We disagree. In essence,
Clonazepam is a benzodiazepine. However, not all benzodiazepines
are Clonazepam. For example, Diazepam is marketed under the name
"Valium" and Clonazepam is marketed under the name "Klonopin."
*See Physician's Desk Reference (PDR)* 2880 (64th ed. 2010); *PDR*
2855. These are not the same drug, and there are significant chemical
differences between the two. *See Id.* However, both Diazepam and
Clonazepam are benzodiazepines. *PDR* 2880 ("Valium (diazepam) is a
benzodiazepine derivative."); *PDR* 2855 ("Klonopin, a benzodi-
azepine, is available[.]"). Thus, "benzodiazepines" is *not* a common
name for Clonazepam, nor are benzodiazepines and Clonazepam
the same thing.

Further, we note that not all benzodiazepines are listed under
Schedule IV. As Agent Joncich testified at trial: "*Most* of the
Benzodiazepines fall under Schedule IV of the North Carolina General
Statutes." (Emphasis added). Agent Joncich did not testify that all
benzodiazepines were listed in Schedule IV. For example, we note
that "phenazepam" is not listed among the sixty-seven enumerated
substances listed in Schedule IV under N.C.G.S. § 90-92. However,
according to the U.S. Department of Justice Drug Enforcement
Administration, phenazepam is a benzodiazepine. *See* DEA
Microgram Bulletin, Volume 42, Number 12, December 2009, 94 (dis-
cussing recovery of "phenazepam (a benzodiazepine)" on a sheet of
paper suspected to contain LSD). Thus, it appears that there exist
benzodiazepines which are not regulated under Schedule IV of the
Controlled Substances Act.

In the case before us, the indictments charged Defendant with certain crimes involving "BENZODIAZEPINES, which is included in Schedule IV of the North Carolina Controlled Substances Act[.]" Pursuant to our review above, we note first that the word "BENZO-DIAZEPINES" is not listed among any of the sixty-seven substances listed in Schedule IV. Further, there exist derivatives of the benzodiazepine category of drugs that are not listed under Schedule IV. Therefore, the indictment was flawed in that it: (1) incorrectly stated that "benzodiazepines" is listed under Schedule IV; and (2) charged Defendant with crimes involving the use of a category of substances, some of which are not regulated under Schedule IV. For reasons detailed above, we cannot agree with the State's argument that "benzodiazepines" is "essentially the same thing as [C]lonozepam." We therefore find that the indictments for the charges involving benzodiazepines are defective, and, as in *Ledwell*, "we cannot regard this defect as a mere technicality, for the chemical and legal definition of these substances is itself technical and requires precision." *Ledwell*, 171 N.C. App. at 332-33, 614 S.E.2d at 415.

We are bound by the principle established under *Ledwell* and *Ahmadi-Turshizi*, that "when an indictment fails to list a controlled substance by its chemical name as it appears in [the relevant Schedule of the North Carolina Controlled Substances Act], the indictment must fail." *Ahmadi-Turshizi*, 175 N.C. App. at 785, 625 S.E.2d at 605 (citing *Ledwell*, 171 N.C. App. at 333, 614 S.E.2d at 415). Because an invalid indictment deprives a trial court of jurisdiction to try a defendant, we must vacate the convictions based on the indictments for delivery of a controlled substance and contamination of food or drink with a controlled substance. *State v. Felmet*, 302 N.C. 173, 176, 273 S.E.2d 708, 711 (1981) ("When the record shows a lack of jurisdiction in the lower court, the appropriate action on the part of the appellate court is to arrest judgment or vacate any order entered without authority.").

*Plain Error/Ineffective Counsel*

Defendant next argues that the trial court erred in instructing the jury regarding the contamination of the pie. Because we have found the indictment on this issue to be fatally flawed, we need not address this argument.

No error in 07 CRS 50108 and 07 CRS 50111.

**HIGH ROCK LAKE PARTNERS, LLC v. N.C. DEP'T OF TRANSP.**

[204 N.C. App. 55 (2010)]

Vacated in 07 CRS 50110 and 07 CRS 50114.

Judges STEELMAN and BEASLEY concur.